THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSE RIVERA, Defendant-Appellant.

First District (6th Division)   No. 1—85—2885

Opinion filed August 18, 1989.

Eliot Samuels, of Chicago (Alan Osheff, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Gael M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Jose Rivera, was convicted of murder and five counts of armed robbery and was sentenced to concurrent prison terms of 75 years for murder and 30 years for each armed robbery conviction. Defendant appeals, contending that he was denied a fair trial by the prosecutor's references to his alleged gang affiliation and to his other crimes, and that the trial court erred in denying his motion to suppress his confessions.

Dixie Cramer testified for the State that on April 8, 1984, she

and James Montesi were at a tavern with some of their friends. At approximately 2 a.m., three men wearing ski masks and carrying guns entered the tavern. One of the men was defendant. He positioned himself in front of the door. The patrons were instructed to put their hands on the bar. Defendant, who was about two feet from Cramer, took her wallet. Defendant was holding a gun. Montesi began to approach defendant. Defendant then fatally shot Montesi and threatened to kill "anybody." After the shooting, one of the other men had the tavern owner open the register. The patrons and owner were herded to the washroom. They emerged from the washroom when the bar was quiet. Defendant and the other two men were gone. On April 26, Cramer identified defendant in a lineup and again at trial.

Bozena Proscanski, owner of the tavern, testified she was talking on the telephone in the bar when a man in a ski mask took the telephone from her and hung it up. She could see his face through the mask. (She identified the man as Armando Ochoa, a codefendant who was tried simultaneously with defendant, using separate juries.) Ochoa had her open the register at gunpoint and took approximately $300. Thomas Tamkin, Russell Cramer and Carl Schlotfeldt also were in the tavern. Each testified to essentially the same set of facts as did Proscanski and Dixie Cramer. Only Dixie Cramer was able to identify defendant.

Defendant was arrested by Sergeant John Farrell on April 24, 1984. He was taken to the police station and, after questioning, made several statements implicating himself in the events of the evening of April 8, 1984.

The statements were introduced into evidence at trial. Defendant indicated that he, Ochoa, and a third individual had decided to make some money. They had guns and ski masks with them. They drove by the tavern and decided to rob it. Defendant stayed in front of the tavern to keep anyone from leaving or entering the tavern. They each had their guns out and had everyone line up so that they could search them one by one for their money. Defendant indicated that the third individual shot the patron who was not cooperating and then placed all the patrons in the washroom. The third individual stated, "[W]e're bad and we'll kill anybody." They split the money and Ochoa burned the ski masks.

We shall first consider defendant's contention that the trial court erred in denying his motion to suppress the confessions.

At the suppression hearing, Farrell testified that he was assigned to investigate the Montesi homicide. On April 24, 1984, Farrell lo-

cated defendant in a parked car. Farrell placed defendant under arrest, handcuffed him, and brought him to an interview room at the police station, Area 5 headquarters. Farrell advised defendant of his *Miranda* rights while in the car and defendant acknowledged that he understood each right. Farrell stated that he did not have a machine gun, that he did not threaten defendant or make promises to him, and that he did not beat defendant.

Officer Wayne Lipsey testified that he was present when Farrell arrested defendant. Lipsey followed Farrell to Area 5 headquarters. Farrell arrived at Area 5 and took defendant to the interrogation room. Farrell uncuffed defendant, and both officers left, locking the door behind them. Neither he nor Farrell struck defendant or showed him a machine gun.

Officer William Wagner testified that he and his partners interviewed defendant at Area 5. Defendant was not handcuffed and had no marks, bruises, or footprints on him. Defendant did not tell Wagner that Farrell or any other officer had threatened him. Wagner heard Officer Lawrence Poli read defendant his rights and heard defendant acknowledge that he understood those rights. Wagner also heard defendant ask Poli to contact Assistant State's Attorney Chris Cronson. Defendant did not ask to see his own lawyer.

Detective Jose Rodriquez testified that he saw defendant at headquarters that morning. Defendant was not handcuffed. Neither Rodriquez nor his partners threatened or beat defendant, nor did they make any promises to him. Rodriquez heard Poli read defendant his rights and heard defendant acknowledge that he understood them. Rodriquez further testified that when defendant was asked if he wanted to see a lawyer, defendant asked to see Assistant State's Attorney Cronson.

Poli testified that he saw defendant around 2 a.m. on April 25, 1984, at Area 5. Defendant was not bruised, nor was he handcuffed to the wall. Poli read defendant his rights, and defendant acknowledged that he understood each right. Neither Poli nor anyone in his presence beat defendant. Defendant asked Poli to contact Cronson because defendant previously had testified for Cronson. Defendant did not ask to call his lawyer. Poli called Cronson and then contacted the felony review department of the State's Attorney's office.

Poli further testified that Assistant State's Attorney Thomas Epach arrived at approximately 7 a.m. Epach read defendant his rights and interviewed defendant from 7:30 a.m. to 12:30 p.m. Epach did not threaten defendant nor did he make any promises to him. Epach wrote down what defendant told him and then read the state-

ment, line by line, back to defendant. In this statement, defendant stated that no threats or promises had been made to him, that he had been fed, and that Epach had given him a coat to wear.

Epach testified that he spoke with defendant at Area 5 on April 25, 1984. He informed defendant that he was the prosecutor, and defendant responded that he knew who he was. Defendant previously had met Epach in Cronson's office. Epach advised defendant of his *Miranda* rights, and defendant indicated that he understood his rights. Defendant told Epach that he was willing to tell what had happened. Epach did not threaten defendant, nor did he make any promises to him. Defendant was not bruised and did not tell Epach that he had been beaten or threatened with a gun.

Defendant signed four armed robbery statements before noon, one shortly after noon, and also signed a murder statement later in the day. Before defendant signed the murder statement, attorney Ronald Kales arrived at Area 5 and said that defendant's family had hired him to represent defendant. Epach informed Kales that defendant had signed the four statements and that he would be charged. Kales did not tell Epach to stop questioning defendant.

At approximately 1:40 p.m., defendant asked to speak to Epach. Epach testified that he told defendant he was still the prosecutor, but that defendant responded "I want to tell you the truth. You got me. I want to tell you the truth." Epach told defendant that his lawyer would tell him not to say another thing. Defendant told Epach that he understood, but that he wanted to tell the truth. Epach again gave defendant *Miranda* warnings and took his statement.

Assistant State's Attorney John O'Donnell testified that he was outside the interrogation room when defendant asked for Epach. O'Donnell stated that at that time, there were no bruises, scratches, blood, or footprints on defendant. O'Donnell called Epach to the interrogation room. He heard Epach tell defendant that his lawyer would not want him to talk to them, but that defendant replied that he wanted to tell the truth. Epach then read defendant his rights again. Defendant indicated that he understood his rights and signed a waiver. No one threatened defendant or made promises. Further, no one told defendant that the papers he was asked to sign were release papers.

Kales testified at the suppression hearing that he went to see defendant at Area 5 on April 25, 1984. He was told by Epach that defendant had confessed to armed robbery and that defendant now was under investigation for murder. Kales stated that defendant was handcuffed to the wall and that he looked tired and unshaven. Kales

also stated that he told Epach that he was not to question defendant further.

Domina Melendez, defendant's mother, testified that she saw defendant at approximately 1 p.m. on April 25, 1984. He was not handcuffed when she saw him. She stated that a blond man came into the room with a paper for defendant to sign. Her niece, acting as interpreter, told her that the papers were for defendant's release.

Carol Hernandez, defendant's 16-year-old girlfriend, testified that she went with Melendez to see defendant. Defendant was handcuffed, his face was scratched, and he had a footprint on his shirt. She stated that she signed a paper given to her by Epach. She initialed the first two pages and signed the third page. Hernandez did not read the papers, but said that Epach told her the papers were release papers.

Archie Perez, defendant's cousin, was in the car with defendant when he was arrested by Farrell. Perez next saw defendant at Area 5. He said that defendant was handcuffed to the wall, had scratches on his face and three footprints on his shirt. Epach questioned Perez and took notes during the questioning. He then asked Perez to sign the papers. Perez signed what Epach had written. The statement was captioned as that of Perez, but Perez stated that he signed the paper only because he thought it was a release form.

Defendant testified that after his arrest, he was taken to the police station. On the way, an officer slapped him twice, and when they reached the station, the driver showed him a machine gun and said, "[T]his is for you, punk." One of the officers kicked him in the groin. Defendant was taken to the interview room, where he was handcuffed. The officers slapped and hit him.

Defendant stated that he asked Poli for his lawyer, but Poli refused. Defendant again requested his lawyer when Rodriquez and Wagner entered the interrogation room. Defendant also asked for Cronson because Cronson would know that defendant did not "do this kind of stuff." Defendant told Poli that he had done Cronson a favor.

When Epach came to the interrogation room, defendant again asked for his lawyer. Defendant said that he signed several papers, but that he did not read them, nor were they read to him. Epach told him that his lawyer was not going to help him. Epach also told him that if he signed the paper regarding the murder, it would not hurt him as it was intended to hurt Ochoa.

Defendant denied that he was advised of his *Miranda* rights at any time. He never asked O'Donnell to get Epach. He also denied

that Epach informed him that he was a prosecutor or that Epach told him that defendant's lawyer would not want him to say anything. Defendant admitted that when he saw the doctor prior to his admission to jail, he did not tell the doctor that he had been kicked or beaten.

In arguing that the trial court erred in denying his motion to suppress his custodial statements, defendant maintains that he was not advised of his *Miranda* rights, that he was improperly interrogated after his request for a lawyer, and that the statements were the result of physical or mental coercion and were therefore, involuntary.

▮▮ Defendant's argument that he was not advised of his *Miranda* rights is untenable. Four police officers and two assistant State's Attorneys testified that defendant had been read his rights on several occasions. Only defendant testified that he did not receive his rights. The trial court's finding was not against the manifest weight of the evidence.

▮▮ ▮ Defendant also argues that he was improperly interrogated after his request for a lawyer. When a suspect requests an attorney, or refuses to waive his right to counsel during interrogation, all questioning must cease. (*Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490.) Further, once an accused has invoked his right to counsel, his responses to further questioning may be admitted only on a finding that he initiated further discussions with the police and knowingly and intelligently waived the right he had invoked. *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.

▮ Defendant claims that he requested to see his lawyer on several occasions. The testimony of the officers and assistant State's Attorneys, however, belies defendant's assertion. The State witnesses testified that defendant was advised of his right to an attorney, but that he instead asked to see Assistant State's Attorney Cronson. The trial court stated that the testimony of these witnesses was credible, and the court's finding was not contrary to the manifest weight of the evidence.

Furthermore, after defendant's lawyer spoke to him, defendant initiated further contact with the State. At that time he was readvised of his rights, acknowledged that he understood those rights, and indicated that he wanted to tell the truth. Defendant then freely waived his rights, signed a written waiver, and gave his statement. Defendant was not questioned in violation of his rights. Rather, we find that defendant knowingly and intelligently waived his rights.

(See *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880; *People v. Torres* (1973), 54 Ill. 2d 384, 297 N.E.2d 142.) Accordingly, the trial court did not err in concluding that defendant had not been interrogated improperly after he had invoked his right to counsel.

■ Defendant also argues that his statements were involuntarily given. Five police officers and two assistant State's Attorneys testified that defendant was not beaten, threatened or offered any promises to induce his statements. While defendant testified that he was beaten, he did not tell the examining physician at jail that he had been beaten. Defendant's cousin and girlfriend testified that defendant's face was scratched and that there was a footprint on his chest, but defendant's mother testified only that defendant looked tired and dirty. The trial court found that defendant's testimony on this issue was incredible, and we cannot say that this finding was against the manifest weight of the evidence.

Accordingly, we find that the trial court did not err in denying defendant's motion to suppress his confessions.

We next address defendant's contentions that he was denied a fair trial because of numerous references by the prosecutor to defendant's alleged gang affiliation and to his other crimes.

Initially, we note that prior to trial, the trial court, at defendant's request, directed the prosecutor to substitute the word "group" for any reference to defendant's "gang" in defendant's confession, and to substitute the word "incident" for any reference to unrelated robberies. Nonetheless, defendant contends that the prosecutor used these words in such a manner as to deny him a fair trial. Defendant points to the fact that after the jury commenced deliberations, they requested information as to which gang defendant belonged.

■ With regard to the prosecutor's reference to defendant's group or gang affiliation, evidence of a defendant's gang membership is inadmissible unless there is a logical connection between gang affiliation and the crime charged. (*People v. Rivera* (1986), 145 Ill. App. 3d 609, 495 N.E.2d 1088.) Nevertheless, when evidence of a defendant's membership in a gang is relevant to an issue at trial, the evidence may not be excluded simply because it also may have a tendency to prejudice the defendant. *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840.

■ Defendant failed to object to those references to gang affiliation made by the prosecutor during closing argument. Both a trial objection and a written post-trial motion raising the issue are required to preserve an issue for appeal. (*People v. Enoch* (1988), 122

Ill. 2d 176, 522 N.E.2d 1124.) Failure to object to final argument constitutes waiver by the defendant. (*People v. Harper* (1981), 94 Ill. App. 3d 298, 418 N.E.2d 894.) Accordingly, we find that defendant has waived review of these statements.

■ Moreover, we believe that the trial court properly permitted the prosecutor to make limited reference to defendant's "group" affiliation. The statements properly demonstrate a prior relationship between defendant and codefendant. Moreover, a prosecutor may comment upon the evidence concerning a witness' credibility. (*People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301.) Here, the statements demonstrate the credibility of defendant's written statement in which he implicated a third party who belonged to a rival group.

Furthermore, our review of the record reveals that defendant mischaracterizes the extent to which the State referred to defendant's group affiliation. The majority of such references took place outside the presence of the jury and cannot be said to have prejudiced defendant in any manner. Additionally, the trial had specifically authorized the State to use the word "group," and as we noted above, we do not believe this authorization to have been an abuse of the trial court's discretion. Moreover, these statements were not made in the context of explicit argument regarding defendant's gang membership. In our view, the references were merely tangential to the prosecutor's argument and were not made in the context of an attempt by the State to suggest that the offense was gang motivated. They did not deny defendant's right to a fair trial.

Defendant additionally contends that he was denied a fair trial by the prosecutor's references throughout the trial to defendant's other crimes. Defendant points to the fact that the trial court denied the State's request to admit evidence of defendant's other crimes. Defendant maintains that the State's veiled references to these other crimes were violations of the trial court order.

■ Our review of the record reveals that defendant has misstated the extent to which the State referred to defendant's other crimes. Further, the prosecutor never referred to "other crimes." Rather, in compliance with the trial court's order, the prosecutor referred to "other incidents" and did so on only a few occasions. We do not believe these few references prejudiced defendant.

The first reference to "other incidents" which defendant cites occurred during the prosecutor's opening statement. In the course of explaining why defendant was arrested and why he was being detained at the police station, the prosecutor stated:

"[The officers] talked to the Defendant Rivera at the police

station concerning certain other things, and when the State's Attorney came on duty at 6:00 a.m., he was notified and he came and talked to Rivera at the police station and took statements concerning certain other things that again are not a subject before you."

The second reference to "other incidents" which defendant cites occurred during direct examination of Assistant State's Attorney Epach. Epach read defendant's signed statement to the jury. The statement had been redacted to refer only to "other incidents." The references established the prior association between defendant and codefendant ("My partner on each of those incidents was a fellow group member named Armando Ochoa"), explained why defendant was arrested and was being detained ("I figured that the police had to be catching on to us." "Today after I spoke with the state's attorney about the other incident I spoke with my lawyer"), and spoke to the credibility of the statement itself ("After he left I got to thinking that the police already had me on the other incident ***").

The trial court stated that every effort was made to protect defendant's rights and that it did not believe that defendant was prejudiced by the references. The court noted that to have taken out the references to any other incident would have given the jury an erroneous impression with regard to defendant's presence at the police station and the length of his detention. We believe the trial court properly permitted the prosecutor to make limited references to other incidents. Defendant received a fair trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and LaPORTA, J., concur.