THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES YOUNG et al., Defendants-Appellants.

First District (4th Division)   Nos. 1—91—1519, 1—91—1522, 1—91—1778, 1—91—1848, 1—91—2087, 1—92—0022 cons.

Opinion filed March 31, 1994.—Rehearings denied May 3, 1994, June 8, 1994, June 10, 1994.

Michael J. Pelletier and Patricia Mysza, both of State Appellate Defender's Office, of Chicago, for appellant James Young.

Rita A. Fry, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellants Michael Myers, James Bannister, Kevin Young, and Thomas Carter.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and LaTisha Foster, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HOFFMAN delivered the opinion of the court:

Defendants, James Young, Michael Meyers, James Bannister, Michael Johnson, Kevin Young and Thomas Carter, were convicted of two counts of first-degree murder and sentenced to life imprisonment following the gang-related shootings of two men near the Stateway Gardens housing complex (Stateway). Defendants appeal from their convictions and sentences, raising the following issues: (1) whether the State violated discovery rules by failing to disclose certain pretrial statements of a State witness; (2) whether James Young and Bannister were proven guilty beyond a reasonable doubt; (3) whether the court erred in admitting evidence of gang affiliation; (4) whether the doctrine of transferred intent applied where both the intended victim and an unintended victim were killed; (5) whether police obtained Johnson's confession in violation of his constitutional right to counsel; (6) whether the court improperly admitted evidence of a prior crime committed by Johnson; (7) whether the court erred in denying Bannister's severance motion; (8) whether James Young's counsel was ineffective by offering the prior inconsistent statements

of State witnesses merely as impeachment rather than substantive evidence; (9) whether the court erred in admitting portions of a State witness's grand jury testimony which were consistent with his trial testimony; (10) whether Bannister was irreparably prejudiced when the court allowed the jury to wait for an absent defense attorney without explanation; and (11) whether the mandatory life imprisonment provision of section 5—8—1(a)(1)(c) of the Uniform Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(c)) violates the eighth amendment prohibition of cruel and unusual punishment.

Defendants were tried jointly by a jury with the exception of Michael Johnson, who was granted a severance and tried separately. The evidence at the consolidated trials of James Young, Meyers, Bannister, Kevin Young, Carter, and Eric Smith, who is not a party to this appeal, is summarized below.

The shootings originated from the ground and first-floor porches of the 3517-3519 South Federal Street building (hereinafter building) of the Stateway complex on the night of November 9, 1989.

Denise Brady, a Stateway resident, testified that about 10 p.m. she noticed two men in dark clothing and ski masks standing near an elevator in the building's open first-floor lobby. Brady descended to the ground-floor lobby, where she saw a man she identified as Kevin Young (hereinafter Young) wearing dark clothes and a baseball cap. Brady testified that Young yelled "come here" and then "come here, motherfucker," in the direction of one of the victims, Dan Williams, who was approaching the building from the street. Young then retrieved a gun from his coat and repeatedly fired at Williams, who began "running and weaving" towards an Illinois Institute of Technology (IIT) research building located across the street. Williams eventually stumbled onto the ground, as Brady fled upstairs towards her apartment. Brady indicated that when she reached the first-floor she saw the two men in ski masks also shooting at Williams. When she looked down, she noticed another two shooters "spaced out" at either side of the building.

Ruth Wilson, who lived in an adjacent building, testified that she was in her bedroom when she heard shots coming from 3517-19. When she looked out of her window she saw at least five men walking away from 3517-19 and towards her building. Each of the men was wearing dark clothing and a hat or hood over his head. Wilson recognized two of them as Young and Carter and saw Young put a gun under his coat. Wilson watched the men until they were out of sight, and then went to look for her son, Deanda Wilson, who was outside.

The State's primary witness, Deanda Wilson (Wilson), identified all of the defendants as members of one particular street gang. Wilson testified that at the time of the shooting he was 12 years old and a member of a gang which was an "enemy" of defendants' gang. About 10 p.m. on the night of the incident, Wilson was on the first floor of the 3519 side of the building. Wilson heard people call out "here comes [Young]," and when he ran to the first-floor porch to observe, he saw the seven defendants approaching all dressed in black clothing. Wilson testified that Young wore a baseball cap and the other six defendants wore knit caps pulled down just above their eyes. Wilson indicated that at that point, all of defendants' faces were uncovered, and he could see them in the light.

Wilson testified that Bannister and another defendant, Eric Smith, arrived at the building first and eventually waited near a janitor's closet under the 3519 side. Wilson testified that at one point they were only 10 feet from him. Wilson then ran up to observe from the second-floor porch and saw Meyers, Young, and Carter standing below him in front of the building. Wilson saw James Young and Johnson on the first-floor porch of the 3517 side, from a distance of 35 feet.

Wilson testified that Dan Williams was standing near the play lot in front of the building when someone yelled "come here, mother-fucker." Williams responded "I ain't have nothing to do with it," after which Meyers, Carter, and Young stepped out from under the building, retrieved guns from their coats, and fired at him. Bannister and Eric Smith similarly stepped out from their position and began firing, as did James Young and Johnson. As the shooting continued for about 15 seconds, Williams stumbled through the play lot and towards the IIT building. Wilson testified that Williams eventually fell between the revolving doors of the IIT building, and defendants fled with their guns in their hands.

On cross-examination, Wilson admitted that he had told police after the shooting that James Young and the others had pulled their caps completely over their faces. Additionally, Wilson had testified before the grand jury that as he stood on the second-floor porch, he knew that Bannister, James Young, and others were standing on the porch "under the building." When asked if he could actually see them, he responded that he could not, but knew they were there "because they wasn't outside the building with the rest."

Testimony from security personnel in the lobby of the IIT research building established that the group of assailants chased Dan Williams towards the IIT building. Multiple shots being directed towards Williams struck and killed Thomas Kaufman, a security guard stationed inside IIT's front doors.

The State's theory at trial was that defendants killed Williams in a case of mistaken identity, to avenge the sexual assault of Young's girlfriend by members of the rival gang, one of whom was also named "Williams." A.W., the victim of the alleged sexual assault, testified that two days prior to the shooting she was approached by the rival gang members who harassed, kicked, and threw objects at her and then brought her to an apartment and sexually assaulted her. Police subsequently arrived and the rival gang members fled the building. A.W. indicated that during the assault, "Williams" repeatedly demanded to know where Young was, at one point threatening A.W. with a gun. A.W. testified that several hours prior to the shooting a meeting was arranged between her and Young at the apartment of Lisa Tolbert, a friend in Stateway. At Young's request, A.W. identified the participants in the sexual assault. Young and Carter subsequently left the apartment, returning later with Johnson, Meyers, and James Young. According to A.W., the five men again left the apartment at approximately 10 p.m., each dressed in black and carrying a gun. A.W. stated that when the men returned approximately 20 minutes later, they were wearing ski masks or stocking caps over their faces. A.W. testified that Young took the guns the men were carrying and placed them in the radiator. The testimony of two police officers established that James Young and Carter were arrested at Lisa Tolbert's apartment the day after the shooting.

Following arguments, all defendants were found guilty of two counts of murder under sections 9—1(a)(1) and (a)(2) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2))), and were sentenced to natural life imprisonment. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(c).) The instant appeal followed.

First, defendants Young, Meyers, Carter, James Young, and Bannister argue that they are entitled to a new trial because the State violated rules of discovery by failing to disclose certain pretrial statements made by A.W. During discovery, the State provided defendants with a written statement A.W. gave police following the occurrence, along with a transcript of her grand jury testimony of November 17, 1989. In these prior accounts, A.W. denied any knowledge of the shooting; claimed to have been out with a cousin that night; claimed that she had not seen Young until 5 or 6 a.m. on the morning after the shooting; and denied any knowledge of James Young or other defendants.

At trial, A.W. testified that her prior account had been untruthful and was motivated by her fear at that time of Young and other gang members in Stateway; however, after she was relocated by the State in February of 1990, she had told Officer Edward Winstead and an

assistant State's Attorney the true account to which she also testified at trial.

Relying on Supreme Court Rules 412 and 415(b) (134 Ill. 2d Rules 412, 415(b)) and the due process and fundamental fairness guarantees of the fourteenth amendment (U.S. Const., amend. XIV), defendants contend they were deprived of a fair trial by the State's failure to disclose A.W.'s latter account upon obtaining it.

The State initially responds that we are bound on this issue by our previous ruling in the appeal of codefendant Eric Smith (*People v. Smith* (1st Dist. 1992), No. 1—91—1760 (unpublished order under Supreme Court Rule 23)), under the doctrine of law of the case. Under this doctrine, a court is bound by its prior rulings of law in opinions or orders in the same case unless the facts require a different interpretation. (*Bradley v. Howard Hembrough Volkswagen, Inc.* (1980), 89 Ill. App. 3d 121, 411 N.E.2d 535.) Law of the case applies, however, only when the prior appeal involved the same question and identical parties as are presently before the court. (See, *e.g., Miscevich v. Commonwealth Edison Co.* (1982), 110 Ill. App. 3d 400, 402-03, 442 N.E.2d 338; *People v. Smith* (1979), 72 Ill. App. 3d 956, 962, 390 N.E.2d 1356.) Although Smith's appeal involved issues very similar to those raised here, none of the defendants in this case were parties to Smith's appeal or had an opportunity to present their own arguments. Therefore, the State's argument fails. See *Miscevich*, 110 Ill. App. 3d 400, 442 N.E.2d 338.

Rules 412 and 415(b) require that the State produce all written or recorded statements of its witnesses and that it supplement this production with any additional material acquired after discovery has been conducted. (134 Ill. 2d Rules 412, 415(b).) However, the trial court has discretion to allow the introduction of evidence which has not been disclosed where there is no showing of surprise or prejudice to the defendant. Additionally, the defendant cannot persuasively claim prejudice if he does not request a continuance to investigate the alleged surprise statement, but instead proceeds with the trial. *People v. Moore* (1988), 178 Ill. App. 3d 531, 533 N.E.2d 463; *People v. Ferguson* (1981), 102 Ill. App. 3d 702, 429 N.E.2d 1321.

■ Assuming, *arguendo*, that the State's failure to disclose the above material violated discovery rules, we do not believe that this so prejudiced defendants as to warrant a new trial. Our review of the record indicates that, when the inconsistency in A.W.'s testimony became apparent, defendants did not object or request a continuance; instead, they endeavored to impeach her by conducting a thorough cross-examination. We are unable to accept the contention that earlier disclosure of A.W.'s testimony would have materially affected

defendants' trial strategy or enabled them to "more adequately discredit" A.W. Thus, there was no error on this issue. *Moore*, 178 Ill. App. 3d 531, 533 N.E.2d 463; see also *People v. Harris* (1988), 123 Ill. 2d 113, 151-52, 526 N.E.2d 335; *People v. Cisewski* (1987), 118 Ill. 2d 163, 514 N.E.2d 970.

Defendants also claim prejudice because the State failed to disclose that police had promised A.W. that she would not be prosecuted for perjury if she gave a different version of events at trial. We find no evidence suggesting that she received any such assurance. In fact, Officer Winstead testified that he informed A.W. that he could make no guarantee of immunity. Additionally, defendants had sufficient opportunity to explore any suspected bias on cross-examination. Thus, defendants have failed to show how disclosure would have affected the outcome of the trial. See *Harris*, 123 Ill. 2d 113, 526 N.E.2d 335.

Next, Bannister and James Young argue that they were not proven guilty beyond a reasonable doubt because their convictions were based largely on the testimony of Deanda Wilson, an admitted rival gang member whose grand jury testimony indicated he could not see defendants at the time of the shooting. James Young further argues that the court improperly relied on the testimony of A.W., who admitted she had been untruthful before the grand jury.

When faced with a challenge to the sufficiency of the evidence, the relevant inquiry for this court is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found defendants guilty beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) In reviewing this case it must be borne in mind that the testimony of one witness may be sufficient to sustain a conviction. (See *Collins*, 106 Ill. 2d 237, 478 N.E.2d 267; *People v. Loferski* (1992), 235 Ill. App. 3d 675, 682, 601 N.E.2d 1135.) Moreover, determinations as to the witness' credibility and the weight to be given their testimony are reserved for the trier of fact. *Collins*, 106 Ill. 2d 237, 478 N.E.2d 267.

■ The evidence established that at the time of the occurrence, seven men wearing dark clothing and hats or hoods approached the building and assumed various positions on the ground and first floors. When Dan Williams approached, Young told him "come here, motherfucker," and after Williams responded that he had "nothing to do with it," all of the defendants opened fire upon him. In lighting which was good or very good, Wilson unequivocally recognized Bannister and James Young as being among those who approached the building and subsequently stepped out and shot at Williams. Furthermore, A.W. identified James Young as being one of the defendants who, about the time of the shooting, left Lisa Tolbert's apartment with

guns after having learned of the sexual assault. We find this sufficient to sustain defendants' guilt, and it is not our function to reevaluate the credibility of these witnesses. (*Collins*, 106 Ill. 2d 237, 478 N.E.2d 267.) While we recognize that A.W.'s grand jury account was untruthful, we also note her explanation for this fact, namely, that she was in fear of certain Stateway gang members at that time. We therefore see no reason to question her trial testimony.

Defendants argue, however, that Wilson's prior statements and grand jury testimony indicated that he could not actually see them at the time of the shooting. Specifically, Wilson testified that he had previously told police that James Young and the others had pulled their caps completely over their faces. Additionally, he indicated to the grand jury that, when he was on the second-floor porch, he could not actually see James Young and Bannister below him, but knew they were there because they were not out in front with the other defendants. We do not find that these statements necessarily contradicted Wilson's trial testimony. Wilson never indicated that the men wore masks over their faces when they approached the scene, which is when Wilson recognized them. Further, the record establishes that when Wilson responded that he could not see defendants, he was referring to the time prior to the shooting rather than to the shooting itself. Indeed, this was completely consistent with his account at trial in which he indicated that these defendants stepped out from under the building when they began shooting. Thus, defendants' argument is without merit.

Defendants next argue that the admission of evidence regarding their alleged gang membership was error and deprived them of a fair trial. Evidence of a defendant's gang affiliation and activity is admissible despite the possibility of prejudice as long as there is evidence linking such activity to the crime charged. (*People v. Smith* (1990), 141 Ill. 2d 40, 58, 565 N.E.2d 900.) Although the State is not required to prove the alleged offender's motive for murder, gang evidence is admissible to furnish a motive for an otherwise inexplicable act and also to show a common design or purpose. (*Smith*, 141 Ill. 2d at 58; *People v. Bryant* (1993), 241 Ill. App. 3d 1007, 1022, 609 N.E.2d 910.) In such cases, the probative value of the evidence is deemed to outweigh its prejudicial impact and the trier of fact is entitled to consider it. *People v. Buchanan* (1991), 211 Ill. App. 3d 305, 320, 570 N.E.2d 344.

■ In the case at bar, the evidence supported the State's theory that Williams and Kaufman were the victims of defendants' mistaken effort to avenge the sexual assault of Kevin Young's close friend, A.W. The day after the assault, a meeting was arranged between

A.W. and Young wherein A.W., at Young's request, named her assailants in the assault. One of the assailants was named "Williams," and they all were proven to be members of a gang which was an "enemy" of Young's gang. Several hours later, Young met with codefendants, they obtained weapons, and went out and committed the shootings at issue. The gang evidence was highly probative in providing a motive for the shooting and in explaining the common purpose and the means by which the crime was carried out. (See *People v. Saunders* (1991), 220 Ill. App. 3d 647, 580 N.E.2d 1246.) Thus, it was properly admitted.

Relying on *People v. Smith* (141 Ill. 2d 40, 565 N.E.2d 900), defendants argue that the gang evidence was irrelevant because the State failed to link Dan Williams to the rival gang or to show that defendants believed he participated in the assault of A.W. That case is distinguishable. In *Smith*, the alleged gang motive was found to be mere conjecture because the State failed to present any evidence that the defendant was a gang member or that he was acting on instructions of a gang leader at the time of the crime. (See *Smith*, 141 Ill. 2d at 58-59.) Conversely, in the instant case, there was much direct evidence linking defendants to the same gang and supporting the gang-retaliation motive. The mistaken-identity theory as to Williams was plausible, and evidence linking him to a gang was unnecessary in light of the remaining proof in this case.

Defendants Johnson, Meyers, Young and Carter seek reversal of their convictions for the murder of Kaufman on the basis that they were premised upon the legal fiction of transferred intent. Defendants acknowledge that this doctrine is well recognized in cases where a defendant intended to kill one individual but instead inadvertently killed another; however, they maintain there is no rational basis to apply it where the defendant succeeded in killing both his intended victim and an unintended person.

■ Defendants cite no authority for this distinction, and we find no basis for it in Illinois law. A defendant is guilty of the first-degree murder of an individual either if he (1) intended to kill or do great bodily harm to that individual *or another*, or knows that such acts will cause death to that individual *or another*; or (2) knows that such acts create a strong probability of death or great bodily harm to that individual or another. (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2).) The committee comments to this section state that the transferred intent principle was recognized through the use of the words "or another," and applies to any situation where "the offender has the mental state which characterizes murder *** even if the person whom he kills is not the one whom he intended to kill." (Ill.

Ann. Stat., ch. 38, par. 9—1, Committee Comments, at 18 (Smith-Hurd 1979).) Clearly, both the plain language of section 9—1(a) and Illinois case law support the application of transferred intent where both the intended and unintended victims are killed. See *People v. Humes* (1979), 78 Ill. App. 3d 255, 397 N.E.2d 130 (doctrine applied where bullet struck intended victim and also another individual); see also *People v. Hickman* (1973), 9 Ill. App. 3d 39, 44, 291 N.E.2d 523 (purpose of doctrine is to prevent those with the requisite culpable mental state from escaping the consequences of their actions, even if those consequences were unintended).

Defendants suggest that because there was no evidence that they saw Kaufman at the security desk during the shooting, their mental state with regard to him was less culpable than for Williams and more resembled recklessness under involuntary manslaughter. (Ill. Rev. Stat. 1989, ch. 38, par. 9—3.) The "strong probability" mental state for first-degree murder, however, does not require direct proof of intent to kill a victim (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2)), but rather permits an inference of intent from the circumstances of the killing, including the firing of a deadly weapon in an area where people could very likely be hit. (See *Humes*, 78 Ill. App. 3d 255; *People v. Colley* (1980), 83 Ill. App. 3d 834, 404 N.E.2d 378.) The evidence showed that defendants not only fired directly at Williams, but also sustained gunfire in an area where other individuals were clearly known or likely to be present. Therefore, their conviction for the murder of Kaufman was proper under the plain language of section 9—1(a), as well as under the transferred intent doctrine incorporated therein.

The next issues are raised by Johnson. He first argues that the court erroneously refused to suppress his confession which was obtained in violation of his fifth amendment right to have counsel present during post-arrest questioning. U.S. Const., amend. V.

Inherent in the prohibition against self-incrimination is an accused's right to counsel during police questioning. (U.S. Const., amend. V; *Edwards v. Arizona* (1981), 451 U.S. 477, 482, 68 L. Ed. 2d 378, 384, 101 S. Ct. 1880, 1883.) Where he clearly asserts this right or refuses to waive it, all questioning must cease (*Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490; *Edwards*, 451 U.S. at 485, 68 L. Ed. 2d at 386-87, 101 S. Ct. at 1885), and any subsequent confession may be admitted only upon a finding that the accused initiated further discussions with police and that he validly waived his previously-asserted right. *Edwards*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880; *People v. Rivera* (1989), 187 Ill. App. 3d 813, 543 N.E.2d 840.

The evidence at the suppression hearing established that Officer Winstead spoke with Johnson the morning following his arrest. Upon receiving his *Miranda* rights and stating that he understood them, Johnson asked to contact his attorney. After conferring with his attorney by telephone, Johnson indicated that he wished to discuss the occurrence and then informed Winstead about a potential alibi defense.

Later that day Winstead told Johnson that an investigation had disclosed that the alleged alibi was ineffective and asked whether he wished to call his attorney again. Defendant declined and then indicated that he wished to discuss his involvement in the shootings. After Winstead again gave him his *Miranda* rights, Johnson gave an oral confession. Johnson later received *Miranda* rights again and gave a written confession.

Relying upon his own testimony at the suppression hearing, Johnson argues that he never validly waived his right to counsel and that his confession resulted from questioning which was improperly re-initiated by Winstead. Specifically, he asserts that he had expected his attorney to arrive at headquarters after speaking with him on the telephone; that he never gave an alibi; and that he made a request to call his counsel again prior to his confession.

■ We find that, after speaking with his counsel, Johnson voluntarily reinitiated communications with Winstead prior to giving his alleged alibi and again before his confession. Apart from Johnson's own assertions, there is no evidence that he made any request to call his counsel a second time. Instead, he elected to proceed with a confession in the absence of his attorney despite repeated *Miranda* warnings. Accordingly, we find he knowingly and voluntarily waived his right to counsel.

Johnson also seeks a new trial on the basis of improperly admitted prior crimes evidence. This evidence consisted of Johnson's statement to police that, several hours before the shooting, he and codefendants made plans to go "hunting" for members of the rival gang to avenge the rape of Young's girlfriend. They went out armed with guns, and when they encountered a man named Rick James, Young shot him. The group then fled to an apartment where they remained for one or two hours before again going out and committing the shooting at issue.

Defendant argues that the prior shooting was not probative and was not sufficiently linked to the crime, because there was no evidence that the victims were members of the rival gang or that they were involved in the rape.

■ Initially, because defendant neither objected to this evidence

at trial nor in his post-trial motion, he has waived it for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) In any event, the argument lacks merit.

Although other crimes evidence is inadmissible if offered merely to show a defendant's propensity to commit crime, it is admissible when relevant *for any purpose other* than propensity, including to prove intent, motive, or absence of mistake. (*People v. Bartall* (1983), 98 Ill. 2d 294, 310, 456 N.E.2d 59.) Evidence is relevant when it tends to make the existence of any fact of consequence more or less probable than without the evidence. (*People v. Illgen* (1991), 145 Ill. 2d 353, 583 N.E.2d 515.) Additionally, the other crimes evidence must possess some threshold level of similarity to the crime charged. *Bartall*, 98 Ill. 2d at 310.

In the case at bar, the two crimes were unquestionably similar. Both attacks were committed by the same group of men and were shown to have been motivated by retaliation for the same sexual assault. Johnson's statement concerning the prior attack explained the motive and common criminal purpose, central issues in this case. (See *Bartall*, 98 Ill. 2d at 310-12.) Accordingly, it was properly admitted.

Defendant Bannister argues that the court erred in refusing to grant him a severance, because there was overwhelming evidence against his codefendants which was irrelevant to him and led the jury to convict him by association.

There is no automatic right to a severance, and defendants indicted jointly must be so tried unless a separate trial is necessary to avoid prejudice to one of the defendants. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 468 N.E.2d 969.) Although severances are traditionally granted either where a codefendant has made hearsay admissions implicating the defendant (*Daugherty*, 102 Ill. 2d at 541), or where respective defenses are so antagonistic that a severance is imperative for a fair trial (*People v. Byron* (1987), 116 Ill. 2d 81, 506 N.E.2d 1247; *People v. Harris* (1990), 198 Ill. App. 3d 1002, 556 N.E.2d 709), the supreme court has also recognized that the quantity and nature of the evidence against codefendants is a " 'vital consideration' " in the severance determination as to an accused. (*Byron*, 116 Ill. 2d at 93, quoting *United States v. Sampol* (D.C. Cir. 1980), 636 F.2d 621, 646 (finding that overwhelming quantity and venality of evidence against codefendants warranted severance).) The decision to grant or deny a severance rests within the sound discretion of the trial court and will not be reversed absent abuse. *Byron*, 116 Ill. 2d at 92.

Relying on *Byron*, Bannister points to the evidence regarding the

activities of some of his codefendants at Lisa Tolbert's apartment before and after the murders. He contends that this evidence prejudiced him because he was never shown to have been present at the apartment nor to have known of the rape that allegedly motivated that shooting.

Bannister's reliance on *Byron*, however, is misplaced. In that case, the defendant made numerous incriminating statements against his codefendant while insisting upon his own innocence. The court concluded that the "bitterly antagonis[tic]" nature of the respective defenses, together with the overwhelming evidence against the codefendant, made severance imperative. *Byron*, 116 Ill. 2d at 93.

■ In this case, there is no suggestion of antagonistic or hostile defenses, nor can we conclude that the complained-of evidence irreparably prejudiced Bannister. The testimony at trial clearly placed Bannister at the crime scene with a weapon and showed that he fired at the victims. A.W.'s testimony about her alleged rape and the events at Lisa Tolbert's apartment, which essentially served to provide the motive for the occurrence, were distinct from the shootings themselves, and the jury was capable of keeping the events separate. (See *Harris*, 198 Ill. App. 3d at 1008-09.) Further, the trial court admonished the jury that it was not to consider against all defendants evidence which pertained solely to some of them. Thus, there was no prejudice.

James Young next contends that his counsel was ineffective because he offered the prior testimony and statements of A.W. and Wilson merely for impeachment rather than as substantive evidence under Code section 115—10.1. Ill. Rev. Stat. 1989, ch. 38, par. 115—10.1.

In order to be afforded a new trial for ineffective assistance of counsel, a defendant must prove both that (1) counsel's performance fell below that reasonably expected of competent attorneys in criminal cases, and (2) defendant was prejudiced by this incompetence. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Weir* (1986), 111 Ill. 2d 334, 337, 490 N.E.2d 1.) To sufficiently demonstrate prejudice, defendant must show with a reasonable degree of certainty that but for counsel's errors, the results of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

With regard to A.W.'s prior statements, defendant has failed to meet either prong of the *Strickland* analysis. At trial, A.W. testified that she informed Kevin Young about her rape at Lisa Tolbert's apartment and that several hours later, Young, James Young, and the others left the apartment with guns. The substance of A.W.'s

grand jury testimony was that she knew nothing about the occurrence, had not seen Kevin Young until the following day, and that she did not know James Young.

■ A.W.'s grand jury testimony, which she admitted was fabricated out of her fear of repercussions from gang members, was little more than a summary denial of the occurrence. In light of the detailed and unwavering account she gave at trial, A.W.'s prior testimony offered very little to exculpate defendant; instead, it was far more effective as used by defense counsel, to attack A.W.'s credibility. This was acceptable trial strategy and not incompetence. See *People v. Rainge* (1991), 211 Ill. App. 3d 432, 570 N.E.2d 431.

Assuming, *arguendo*, that Deanda Wilson's prior statement and grand jury testimony should have been offered substantively, we cannot conclude that this omission prejudiced defendant. As stated earlier in this opinion, Wilson's prior testimony did not indicate that he was unable to see James Young at the time of the shooting. To the contrary, Wilson specifically testified that his prior testimony referred to the period before the shooting commenced and that he was able to see Young at the moment he fired his weapon. Thus, defendant has failed to meet the second element under *Strickland*, and his contention fails.

Defendants Meyers, Kevin Young and Carter argue that the admission of Wilson's grand jury testimony as to James Young prejudiced them because it included Wilson's prior consistent statements as to their participation in the occurrence.

■ Having omitted this issue from their post-trial motions, defendants have failed to properly preserve it. (*Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124; *People v. Henderson* (1990), 142 Ill. 2d 258, 568 N.E.2d 1234.) While we recognize the inherent danger in the improper admission of prior consistent statements (see *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41; *People v. Smith* (1985), 139 Ill. App. 3d 21, 486 N.E.2d 1347), we do not believe that the testimony in this case so prejudiced defendants as to constitute plain error. The evidence of these defendants' guilt was overwhelming, and the reference to them in the prior testimony was relatively minor in light of the volume of evidence at trial. Additionally, the court instructed the jury to consider the prior testimony only as impeachment evidence. Accordingly, the argument fails.

Near the end of trial and during proceedings outside the presence of the jury, Carter's counsel left the courtroom without leave of court and was gone for a period of 30 to 45 minutes. During this absence the court recalled the jury, informing it that proceedings would resume upon defense counsel's return. Bannister now argues that the

court irreparably prejudiced him by recalling the jurors and allowing them to wait in the jury box with no explanation other than the absence of counsel.

We note that there was no objection by Bannister at the time the jury was recalled or at any point thereafter. Nor did Bannister raise this issue in his own post-trial motion. Accordingly, it is waived for review. (*Enoch*, 122 Ill. 2d 176.) In any event, the argument is devoid of merit. In support of his argument, Bannister relies upon cases in which the court made highly inflammatory comments towards or about the defense in the presence of the jury. (See *People v. Connor* (1988), 177 Ill. App. 3d 532, 532 N.E.2d 520; *United States v. Spears* (7th Cir. 1977), 558 F.2d 1296.) While a trial judge's comments constitute reversible error where they are a major factor in the conviction or where they prejudiced the verdict (*Harris*, 123 Ill. 2d 113), there were no inflammatory comments in this case. We cannot accept that Bannister was prejudiced because the jury had to wait for co-counsel.

Defendants Meyers, Kevin Young, and Carter finally argue that the mandatory life imprisonment statute under which they were sentenced violates the eighth amendment prohibition against cruel and unusual punishment.

Section 5—8—1(a)(1)(c) of the Uniform Code of Corrections mandates a sentence of life imprisonment without parole in cases of multiple-murder convictions. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(c).) Defendants contend that this was cruel and unusual punishment because it failed to take into account the differences in their mental states between the killing of Williams and Kaufman.

In *Harmelin v. Michigan* (1991), 501 U.S. 957, 115 L. Ed. 2d 836, 111 S. Ct. 2680, the Supreme Court addressed the issue of whether the eighth amendment contains a proportionality guarantee. A plurality concluded that it did not except with regard to the imposition of the death penalty in certain cases. (*Harmelin*, 501 U.S. at 993-94, 115 L. Ed. 2d at 864, 111 S. Ct. at 2701.) While three justices concluded that a narrow proportionality principle existed, they contemplated circumstances far more extreme than those presented in the instant case, and reasserted the principle that sentence length was a matter reserved for determination by State legislatures. See *Harmelin*, 501 U.S. at 999-1000, 115 L. Ed. 2d at 868, 111 S. Ct. at 2704.

Indeed, the validity of section 5—8—1(a)(1)(c) has been repeatedly upheld by Illinois courts (see *People v. Glenn* (1992), 233 Ill. App. 3d 666, 599 N.E.2d 1220; *People v. Fauntleroy* (1991), 224 Ill. App. 3d 140, 586 N.E.2d 292), and challenges similar to that raised by

defendants in this case have been rejected. (See *People v. Rodriguez* (1985), 134 Ill. App. 3d 582, 480 N.E.2d 1147.) We therefore find defendants' argument to be without merit. See also *People v. Foster* (1990), 198 Ill. App. 3d 986, 556 N.E.2d 1214.

For the foregoing reasons, defendants' convictions and sentences are affirmed.

Affirmed.

CAHILL, P.J., and JOHNSON, J., concur.