(No. 105887.—)

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES BANNISTER, Appellant.

*Opinion filed October 29, 2009.—Rehearing denied January 25, 2010.*

2

Edwin A. Burnette and Abishi C. Cunningham, Jr., Public Defenders, of Chicago (Lester Finkle and Erica Reddick, Assistant Public Defenders, of counsel), for appellant.

Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg and John E. Nowak, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Justices Thomas, Garman and Karmeier concurred in the judgment and opinion.

Justice Freeman dissented, with opinion, joined by Justices Kilbride and Burke.

## OPINION

Defendant James Bannister was convicted of two counts of first degree murder and sentenced to natural

life imprisonment for his role in a gang-related shooting. His convictions and sentence were affirmed on direct appeal. *People v. Young*, 263 Ill. App. 3d 627 (1994). The defendant then filed a postconviction petition, alleging actual innocence because the key witness for the State had recanted his trial testimony. The trial court granted the defendant's petition, vacated his convictions, and ordered a new trial. After a bench trial, the defendant was again convicted of two counts of first degree murder and sentenced to life imprisonment. On appeal, the defendant asserted that, *inter alia*, he was denied due process and deprived of a fair trial because the State had entered into a plea agreement containing a so-called consistency provision with one of the defendant's accomplices. The appellate court affirmed the defendant's convictions and sentences. 378 Ill. App. 3d 19.

For the reasons that follow, we also affirm.

## BACKGROUND

On November 9, 1989, several men shot at Dan Williams from around a building in the Stateway Gardens housing complex in Chicago. Williams ran away from the gunfire and toward a building on the campus of the Illinois Institute of Technology (IIT). Williams was shot and killed at the revolving door of the building. Thomas Kaufman, a security guard inside the building, was shot and killed by a stray bullet. The defendant and several of his fellow gang members, including Michael Johnson, were charged with murder.

At trial, the only direct evidence against the defendant was the testimony of Deanda Wilson, a 12-year-old member of a rival gang. Wilson testified that on the night of the shooting he saw the defendant and six other men around a building in the Stateway Gardens housing complex. According to Wilson, Williams was near a play lot in front of the building when someone called out to him. Following a verbal exchange, the defendant and his

fellow gang members shot at Williams, and Williams stumbled toward the IIT building. Wilson stated that the shooting continued for about 15 seconds before the defendant and his accomplices fled. The defendant presented an alibi defense, calling four witnesses who testified that he was at home at the time of the shooting. A jury found the defendant guilty of two counts of first degree murder, and he was sentenced to life imprisonment. The defendant's convictions and sentence were affirmed on direct appeal. *Young*, 263 Ill. App. 3d 627.

In April 1993, the defendant filed a *pro se* postconviction petition, and more than two years later in July 1995, defense counsel filed a supplemental petition, alleging actual innocence based on Wilson's recantation of his trial testimony implicating the defendant. The trial court dismissed the defendant's petition without an evidentiary hearing, but the appellate court reversed and remanded. The appellate court held that the trial court should have conducted an evidentiary hearing regarding Wilson's recantation. On remand, the circuit court conducted an evidentiary hearing and found that, with respect to the defendant, Wilson's trial testimony was not accurate and truthful and that there was no corroboration for his implication of the defendant. The court concluded that the outcome of the defendant's trial likely would have been different without Wilson's perjured testimony. The trial court granted the defendant's request for postconviction relief, vacated his convictions and sentences, and ordered a new trial.

The defendant waived his right to a jury trial, and the cause proceeded to a bench trial. The State's key witness was the defendant's accomplice, and a codefendant at his first trial, Michael Johnson. Johnson, who had been tried separately, had also been convicted of both murders and sentenced to natural life imprisonment. Johnson agreed to testify against the defendant pursuant

to a plea agreement with the State. The agreement stated:

"IT IS AGREED that Michael Johnson will testify truthfully in all matters regarding the 1st degree murders of Dan Williams and Thomas Kaufman, which occurred on November 9, 1989, at approximately 10:00 p.m. at or near 3517-19 S. Federal, Chicago, Cook County, Illinois. Such truthful testimony shall be consistent with Michael Johnson's post-arrest statements in [sic] December 28, and December 29, 1989, to Chicago Police officers and Cook County Assistant State's Attorneys and his statements made to Cook County State's Attorney personnel during his pre-plea agreement interviews on April 29 and May 24, 2004.

It is agreed that Michael Johnson will testify truthfully in the case of People v. James Bannister ***.

In exchange for Michael Johnson's truthful testimony in the above matters, it is agreed that Michael Johnson shall withdraw all appeals and post-conviction petitions in his case, *** and forever waive any and all future appeals, post-conviction petitions or motions to vacate pleas. It is further agreed that the parties will move to vacate the existing sentence in Michael Johnson's case *** and that the case will be placed back on the Honorable James Schreier's trial call. It is agreed that Michael Johnson shall plead guilty to the 1st degree murder counts involving Dan Williams, and the State will nolle pros the 1st degree murder counts involving Thomas Kaufman. The State will recommend that Judge Schreier resentence Michael Johnson to 60 years in the Illinois Department of Corrections ('I.D.O.C.'). This agreement is contingent on Judge Schreier's acceptance of its terms in their entirety.

It is further agreed that the State shall place Michael Johnson in the Witness Program Living Unit until his trial testimony in open court is completed. After his testimony is completed, Michael Johnson shall be remanded to the I.D.O.C. The State shall recommend to I.D.O.C. that Michael Johnson be segregated from *** co-defendants and that Michael Johnson be housed in a medium-security prison, or, if that's not possible, in the Pontiac Correctional Center."

The agreement also contained a page of limitations, which stated that the agreement was "null and void" if Johnson failed "to truthfully testify under oath in open court" against the defendant or his representations "during his post-arrest statements and his pre-plea agreement interviews, upon which this agreement was predicated" were found false. Johnson, his attorney, and two assistant State's Attorneys signed the agreement.

At trial, the State called Johnson as a witness and asked him first about the agreement. Johnson stated that his understanding was that in exchange for his testimony and guilty plea, the State would "nolle" one of the murder counts, recommend a sentence of 60 years, and request that he be transferred from Tamms Correctional Center, Illinois' "super-max" prison. Johnson understood that his sentence remained within the trial judge's discretion and that his transfer remained within the discretion of the Department of Corrections.

Johnson then testified about the murders. According to Johnson, in 1989, he had been a member of the Gangster Disciples street gang for approximately 10 years. On the evening of November 9, 1989, he was walking through the Stateway Gardens housing complex with James Young and Michael Meyers when they met the defendant, Eric Smith, Thomas Carter, and Kevin Young at an apartment building in the complex. All seven men went upstairs to the apartment of Kevin Young's niece and talked for an hour about the recent sexual assault of Young's girlfriend. The men believed that Young's girlfriend had been assaulted by members of the Del Vikings street gang, and they hatched a plan to shoot Del Vikings in revenge.

The men then armed themselves, left the apartment, and proceeded to another building in the complex. There, they encountered a man known as "Rick James," who greeted the defendant by his nickname. Kevin Young shot

at "Rick James." The men returned to the apartment of Kevin Young's niece, where they talked and smoked for approximately an hour. The men again left the apartment and proceeded to another building in the complex. There, they encountered Daniel Nicholson, whom they robbed. The men went to the building where they began, and where Johnson lived. Johnson testified that he went upstairs to his apartment to get a ski mask for himself and some "wave" caps for Kevin Young and Carter.

According to Johnson, the men walked to yet another building in the complex. Standing near the building, Johnson heard Smith say, "Come here, mother***." After hearing gunshots, he walked with Meyers to the front of the building, where he saw Williams running while the defendant, Smith, Carter, Kevin Young, and James Young were firing their guns at him. Johnson testified that he shot at Williams as he crossed a play lot, jumped the fence, and ran toward the IIT building. According to Johnson, when the shooting eventually stopped, the seven men went to an apartment in another building and waited until the police left the area.

Johnson's testimony was substantially consistent with the statement that he gave to the police on December 29, 1989, the day after his arrest. Johnson acknowledged that he initially denied any involvement in the shootings and that, prior to his trial, he had moved to suppress his inculpatory statement, asserting that he had not been advised of his constitutional rights by the police. Johnson stated that the basis for this motion was untrue because he had been advised of his rights before making his statement. Defense counsel rigorously cross-examined Johnson as to the specific terms of the plea agreement and his motivation for entering into the agreement.

As he had in his first trial, the defendant again presented an alibi defense and called several witnesses

who testified that he was at home on the night of the shootings. The trial court found the defendant guilty on both counts of first degree murder and sentenced him to life imprisonment.

The defendant appealed, raising the issue of the constitutional validity of the State's plea agreement with Johnson. The appellate court affirmed his conviction and sentence, holding that the defendant was not denied due process. 378 Ill. App. 3d 19. We allowed the defendant's petition for leave to appeal. 210 Ill. 2d R. 315(a).

## ANALYSIS

The central issue in this appeal is whether the plea agreement between the State and Johnson violated the defendant's right to due process. Our review is *de novo*. *People v. Burns*, 209 Ill. 2d 551, 560 (2004); *People v. Lindsey*, 199 Ill. 2d 460, 463 (2002).

Initially, the defendant argues that he has standing to challenge the validity of this plea agreement. The defendant asserts that, while plea agreements are guided by contract law principles, these principles must give way when an agreement raises constitutional concerns. According to the defendant, "When others conspire to illegally develop evidence against a defendant, due process and fundamental fairness require that a defendant must have *** standing to challenge that conduct."

Absent due process concerns, the validity of a plea agreement is generally governed by contract law. *People v. Henderson*, 211 Ill. 2d 90, 103 (2004); *People v. Evans*, 174 Ill. 2d 320, 326 (1996). Under contract law, there is a strong presumption that the agreement benefits the parties to it, and not a third party, and this presumption may be overcome only by evidence manifesting an affirmative intent by the parties to benefit the third party. See *Estate of Willis v. Kiferbaum Construction Corp.*, 357 Ill. App. 3d 1002, 1007 (2005), citing *Bates & Rogers Construction Corp. v. Greeley & Hansen*, 109 Ill. 2d 225

(1985). Here, the defendant was not an intended beneficiary of the plea agreement between the State and Johnson. Therefore, he lacks standing to argue that the agreement was invalid.

The defendant compares the State's actions here in procuring Johnson's testimony to efforts by the State to secure involuntary confessions. According to the defendant, however, his argument differs from that of a defendant vicariously raising a fourth amendment claim because he was the "direct target" of the State's conduct. The defendant, however, neither explains his reasoning nor cites any authority in support of it. Any defendant aggrieved by the introduction of evidence produced by an illegal seizure against a third party could make the same argument, but that argument would fail. See *People v. Kidd*, 178 Ill. 2d 92, 135 (1997) ("A fourth amendment violation can be urged successfully only by those whose rights have actually been violated by the search itself, not by those who have been aggrieved solely by the introduction of damaging evidence"). The State negotiated with Johnson to secure his testimony. Indeed, the State often bargains for accomplice testimony. The fact that that testimony would be used at the defendant's trial is unremarkable. Further, the defendant's argument that the State lacked the authority to enter into a plea agreement with Johnson is unavailing. Under the revestment doctrine, litigants may revest a trial court with personal and subject matter jurisdiction, after the 30-day period following final judgment, if they actively participate in proceedings that are inconsistent with the merits of the prior judgment. See *People v. Minniti*, 373 Ill. App. 3d 55, 65 (2007), citing *People v. Kaeding*, 98 Ill. 2d 237, 240-41 (1983); *People v. Henry*, 329 Ill. App. 3d 397, 403 (2001).

The larger problem for the defendant is that even if he had standing to contest the validity of the agreement,

its validity would not affect its admissibility. That is, even if the trial court, in the case against the defendant, had somehow found a reason to reach the validity of Johnson's plea agreement—an agreement that was still executory and had yet to be accepted by the trial court—and invalidated it, the remedy would not have been to suppress his testimony. The remedy would have been to void the agreement. As the appellate court correctly observed, a plea agreement between a witness and the State that cannot be enforced has no effect on the admissibility of that witness' testimony at trial. 378 Ill. App. 3d at 35, citing *People v. Caban*, 318 Ill. App. 3d 1082, 1087-89 (2001). If the agreement had been deemed invalid, Johnson would have remained convicted of two murders and remained incarcerated at Tamms, and his testimony would have remained in the case against the defendant.

However, even though the defendant lacks standing to challenge the validity of the agreement, he does not lack the ability to challenge Johnson's testimony. A defendant may always question a witness on matters affecting his credibility and bias. The issue, then, becomes whether the plea agreement itself so undermined Johnson's credibility that we must conclude the defendant was denied a fair trial.

We note that the defendant does not challenge the sufficiency of the evidence against him. The defendant argues simply that, as a matter of constitutional law, a plea agreement by which the State secures an accomplice's testimony is invalid when it contains a so-called consistency provision. According to the defendant, plea agreements that place a witness under a strong compulsion to testify in a particular fashion should be condemned by this court. The defendant insists, "The State cannot require [a] co-defendant to tell the truth and then tell the co-defendant what is the truth." The

defendant concedes that if the plea agreement had simply required Johnson to testify truthfully, he would have had the opportunity to do so. But the State took away this opportunity when it told him that the truth was his post-arrest and court-reported statements in 1989, and his statements to prosecutors in 2004.

The defendant relies primarily upon *People v. Medina*, 41 Cal. App. 3d 438, 116 Cal. Rptr. 133 (1974), and *State v. Fisher*, 176 Ariz. 69, 859 P.2d 179 (1993). In *Medina*, two defendants were charged with murder. Three of their accomplices testified against them pursuant to agreements in which the accomplices received immunity in exchange for testimony consistent with prior recorded statements. The California Court of Appeal held that "a defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." *Medina*, 41 Cal. App. 3d at 455, 116 Cal. Rptr. at 145.

However, the rule in *Medina*, which seems so categorical to the defendant, was clarified in a subsequent case. In *People v. Jenkins*, 22 Cal. 4th 900, 1010, 997 P.2d 1044, 1119-20, 95 Cal. Rptr. 2d 377, 460 (2000), the California Supreme Court rejected the contention that the testimony of an accomplice pursuant to a plea agreement is inherently unreliable. That court held that a plea agreement requiring an accomplice testify fully and truthfully is valid, "even if it is clear the prosecutor believes the witness's prior statement to the police is the truth, and deviation from that statement in testimony may result in the withdrawal of the plea offer." *Jenkins*, 22 Cal. 4th at 1010, 997 P.2d at 1120, 95 Cal. Rptr. 2d at 460. Such an agreement does not dictate the accomplice's testimony in a manner that would offend due process. *Jenkins*, 22 Cal. 4th at 1010, 997 P.2d at 1120, 95 Cal. Rptr. 2d at 460.

In *Fisher*, the defendant was charged with first degree murder. At trial, the defendant's wife invoked her fifth amendment rights and refused to testify, but a letter memorializing an agreement between her and the State was admitted into evidence. The letter, signed by the defendant's wife and her attorney, stated that she agreed that her testimony at trial would not "vary substantially" from prior statements she had made to police. The defendant was convicted of first degree murder and sentenced to death. He then filed a motion for a new trial based on newly discovered evidence— namely, his wife's confession to the murder. The trial court granted this motion, and the State appealed. The Arizona Supreme Court affirmed, holding that plea agreements with consistency provisions, but without any overriding requirements of truthfulness, "undermine the reliability and fairness of the trial and plea bargaining process and taint the truth-seeking function of the courts by placing undue pressure on witnesses to stick with one version of the facts regardless of their truthfulness." *Fisher*, 176 Ariz. at 74, 859 P.2d at 184.

But in a subsequent case, the Arizona Supreme Court explained:

> "The critical issue is not whether the witness will feel an obligation to testify to the same facts earlier told the prosecutors or police, but rather whether the prosecution has conditioned the plea agreement upon such testimony, regardless of the truth of the earlier statement. [Citation.] All accomplice plea agreements put some pressure on a cooperating witness. [Citation.] But a consistency agreement has the strong potential to procure untruthful testimony if the agreement is not also conditioned upon the requirement of truthful testimony. [Citation.] It is this tainting of the 'truth-seeking function of the courts' that makes consistency provisions invalid. [Citation.]" *State v. Rivera*, 210 Ariz. 188, 191, 109 P.3d 83, 86 (2005).

The *Rivera* court noted that safeguards, such as full disclosure of the plea agreement to the finder of fact and

cross-examination, adequately protect a defendant's rights. *Rivera*, 210 Ariz. at 192, 109 P.3d at 87. See *State v. Nerison*, 136 Wis. 2d 37, 45, 401 N.W.2d 1, 4 (1987) ("Cross-examination, not exclusion is the proper tool for challenging the weight and credibility of accomplice testimony").

The appellate court here relied on *State v. Bolden*, 979 S.W.2d 587 (Tenn. 1998), and *People v. Jones*, 236 Mich. App. 396, 600 N.W.2d 652 (1999). In *Bolden*, the defendant and an accomplice were charged with first degree murder. The accomplice entered a plea agreement with the State, under which he agreed to plead guilty and testify truthfully, and consistent with an earlier statement to the police, against the defendant in exchange for a reduced sentence. The defendant was convicted and appealed.

The Supreme Court of Tennessee observed that accomplice testimony is generally admissible even if it results from a plea agreement. *Bolden*, 979 S.W.2d at 590. The court noted, though, that other courts have required safeguards to be followed before admitting such testimony; these safeguards include the full disclosure of the terms of any plea agreement and the opportunity for full cross-examination. *Bolden*, 979 S.W.2d at 590. The court further noted that other courts have added the requirement that such testimony may not be conditioned on the witness following a script. The court stated that " 'it is only where the prosecution has bargained for false or specific testimony, or a specific result, that an accomplice's testimony is so tainted as to require ... preclusion.' " *Bolden*, 979 S.W.2d at 591, quoting *State v. Burchett*, 224 Neb. 444, 456, 399 N.W.2d 258, 266 (1986). The court distinguished on their facts cases in which the plea agreement required only that the witness testify in a particular fashion or that the testimony produce a specific result, without regard to the truthfulness of the

testimony. *Bolden*, 979 S.W.2d at 592 n.3. The *Bolden* court stated that because the plea agreement specifically required the codefendant to testify truthfully, that condition "necessarily engulfed" the other terms in the agreement, which "hinged upon truthful testimony." *Bolden*, 979 S.W.2d at 592. The court held that the codefendant's testimony did not violate the defendant's rights to due process and a fair trial. *Bolden*, 979 S.W.2d at 593.

In *Jones*, the defendant was charged with first degree murder. At trial, four accomplices testified against the defendant pursuant to plea agreements. These agreements required the accomplices to testify truthfully about the defendant's involvement in the offense, and consistent with their original statements to the police, in return for immunity. The defendant was convicted, and on appeal argued that he was denied due process because the plea agreement required the accomplice to provide specific testimony.

The Michigan Court of Appeals initially stated that "in most cases, a promise of immunity or other favorable treatment is relevant only to the issue of the credibility of the witness, and not to the admissibility or the immunized testimony." *Jones*, 236 Mich. App. at 405, 600 N.W.2d at 656. The court acknowledged that several state courts have held that the prosecution may not bargain with an accomplice in exchange for testimony conforming to a script, without regard for the truth. *Jones*, 236 Mich. App. at 405-06, 600 N.W.2d at 656. Underlying this rule, asserted the court, was the concern that a witness placed under a strong compulsion to testify to a particular version of events is "no longer a free agent whose credibility can be evaluated" by the finder of fact. *Jones*, 236 Mich. App. at 406, 600 N.W.2d at 656. The court observed that although the immunity agreements may provide some incentive for the witnesses to conform their trial testimony to their prior accounts of the incident, they

did not violate the defendant's rights where the prosecution expressly conditioned its grants of immunity on the promises that the witnesses would provide truthful testimony. *Jones*, 236 Mich. App. at 406, 600 N.W.2d at 657. The *Jones* court concluded that when a prosecutor makes the decision to bargain with a witness on the basis of representations made by the witness during negotiations with the State, it is reasonable for the prosecutor to rely on the witness' assertion that such representations are truthful and to expect that the witness' trial testimony would be essentially consistent with the original information upon which the State's promise of leniency was induced. *Jones*, 236 Mich. App. at 407, 600 N.W.2d at 657. We find *Bolden* and *Jones* persuasive.

"There is no question that '[t]he disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called "plea bargaining," is an essential component of the administration of justice.' " *Henderson*, 211 Ill. 2d at 102, quoting *Santobello v. New York*, 404 U.S. 257, 260, 30 L. Ed. 2d 427, 432, 92 S. Ct. 495, 498 (1971). The State may bargain directly with a defendant to dispose of a case, or it may bargain with a defendant's accomplice to secure testimony against the defendant in an effort to dispose of a case. Though accomplice testimony by its nature is fraught with serious weaknesses, it is generally admissible at trial, even where it was procured by an offer of a lenient sentence and secured by a plea agreement. See *People v. Tenney*, 205 Ill. 2d 411, 429 (2002). That is, "bargaining for specific trial testimony, i.e., testimony that is essentially consistent with the information represented to be factually true during negotiations with the State, and withholding the benefits of the bargain until after the witness has testified, is not inconsistent with the search for truth or due process." *Sheriff, Humboldt County v. Acuna*, 107 Nev. 664, 669, 819 P.2d 197,

200 (1991); see also *State v. Clark*, 48 Wash. App. 850, 860, 743 P.2d 822, 828 (1987) ("[j]ust because an immunity agreement rests on a premise that the requested testimony will be of some benefit to the State, the agreement is not necessarily rendered impermissibly coercive"). It is reasonable for the State to condition its largesse toward an accomplice on the accomplice testifying consistently with what the State believes is the truth, as long as the agreement's overriding requirement is that the accomplice also testify truthfully.

Here, the plea agreement repeatedly and explicitly obligated Johnson to testify truthfully. The agreement also provided that Johnson would testify in a manner that was consistent with his prior statements to police and to prosecutors, but if any of the representations contained in his prior statements were found to be false, the agreement would be rendered null and void. Truthfulness was the overriding requirement of the agreement. The agreement neither compelled Johnson to disregard his witness' oath, nor bound him to a particular script or result. Accordingly, Johnson's testimony was not tainted by the plea agreement, and the admission of his testimony did not violate the defendant's rights to due process and a fair trial.

Our legal system tests a witness' credibility through cross-examination and leaves the determination of that credibility to the finder of fact. See *People v. Evans*, 209 Ill. 2d 194, 213 (2004), quoting *Hoffa v. United States*, 385 U.S. 293, 311, 17 L. Ed. 2d 374, 387, 87 S. Ct. 408, 418 (1966).

> "In most instances, any potential for prejudice to a defendant's case will be avoided by allowing the witness to testify subject to searching cross-examination intended to develop fully any evidence of bias or motive on the part of the witness, or improper conduct on the part of the State. Every fact that might in some way influence the truthfulness and credibility of the witness's testimony should be

laid before the [finder of fact]. [Citation.] This ensures no unnecessary barriers will be imposed on the State's ability to bargain for truthful testimony, and at the same time ensures the [finder of fact] will be able to determine what weight, if any, in light of all the evidence, to give the witness's testimony." *State v. McGonigle*, 401 N.W.2d 39, 42 (Iowa 1987).

The State, on direct examination of Johnson, fully disclosed the terms of the plea agreement with him, and the defendant had an opportunity to cross-examine Johnson about the agreement and the benefits he would receive. The trial court heard the details of Johnson's plea agreement and found him to be credible nonetheless. As the finder of fact, it was the trial court's responsibility to resolve alleged inconsistencies and conflicts in the evidence, as well as to weigh the testimony and determine the credibility of the witnesses. See *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

## CONCLUSION

For the reasons that we have stated, we affirm the judgment of the appellate court.

*Affirmed.*

JUSTICE FREEMAN, dissenting:

This appeal presents significant constitutional issues of first impression for Illinois courts, defining the limits of the State's power to secure testimony against an accused by entering into a contingent plea agreement with an already-convicted accomplice which requires him to testify "truthfully," but also "consistently" with certain prior statements. It is my view that these serious matters require in-depth analysis and careful consideration of the defendant's arguments that such plea agreements violate an accused's right to due process and a fair trial because they unduly interfere with the truth-seeking process and, therefore, should be prohibited in our courts. Because my colleagues now place their stamp of approval

upon the State's use of contingent plea agreements containing consistency clauses without addressing any of the arguments advanced by defendant in the context of the unique facts of this appeal, I cannot join the majority opinion.

Defendant was convicted in 1991 of two counts of first degree murder and sentenced to life imprisonment. During that trial, the State's sole witness against defendant was a 12-year-old rival gang member, who testified that he saw defendant shoot the victims. Subsequently, however, this witness recanted his testimony, and, during postconviction proceedings, defendant was granted a new trial. It is this second trial, which took place in 2004, which is the subject of this appeal. The State's only direct evidence against defendant in this new trial came through the testimony of Michael Johnson. Although Johnson had been a codefendant during the 1991 prosecution, he was tried separately, and the State did not present testimony from Johnson against defendant during those proceedings. Like defendant, Johnson had been convicted by a jury of two counts of first degree murder and sentenced to natural life imprisonment with no possibility of parole. Johnson was incarcerated at Tamms Correctional Center, a "super" maximum-security facility, when the State approached him in January 2004—13 years after the jury convicted him of double murder—with the offer of a plea bargain in exchange for his testimony against defendant in defendant's second trial. For six months—from January to June 2004—the State negotiated the terms of this plea agreement with Johnson.

Ultimately, the parties struck a deal in which Johnson would "testify truthfully" against defendant. The agreement required that "[s]uch truthful testimony *shall* be consistent with" (emphasis added) two of the several postarrest statements Johnson made to law enforcement

officials subsequent to his arrest for the murders in 1989, as well as with Johnson's preplea agreement interviews with the State, which occurred in April and May 2004. As part of his plea, Johnson agreed to "withdraw all appeals and post-conviction petitions in his case," and "forever waive any and all future appeals, post-conviction petitions or motions to vacate pleas." In exchange, the State agreed to "move to vacate [Johnson's] existing sentence," and promised that Johnson's "case will be placed back on the [circuit court's] trial call." The agreement called for Johnson to then plead guilty to one count of first degree murder, and provided that the State would *"nolle pros"* the second first degree murder count of which Johnson had previously been convicted. Finally, the State agreed to recommend that Johnson be resentenced to 60 years' incarceration, and that he be moved from the Tamms facility to a lower-level medium-security facility to serve the remainder of his sentence.

Johnson thereafter testified during defendant's second trial. It was only *after* defendant was convicted that the plea agreement between Johnson and the State was executed. The circuit court's docket sheet reflects that on July 27, 2004, Johnson's "conviction of 2 counts of murder [was] vacated by agreement of the parties." Thus, as a result of Johnson's cooperation with the State and adherence to the provisions in the plea agreement, his two jury convictions for first degree murder entered 13 years earlier were erased, he pled guilty to only one count of first degree murder, was resentenced to 60 years' imprisonment with credit for time already served, and was transferred from Tamms to a lower-security facility.

Defendant in this court questions the propriety of the plea agreement between Johnson and the State, asserting that his constitutional right to due process and a fair trial were violated by the method employed by the State in securing Johnson's testimony, which was then

used against defendant to obtain a conviction in his second trial. In addition, defendant also advances the broader argument that this court should generally prohibit the use of consistency clauses in contingency plea agreements, as such clauses interfere with due process and the search for the truth, placing a witness under a strong compulsion to testify to a particular set of facts and virtually "scripting" the witnesses' testimony.

The majority holds that defendant lacks standing to contest the validity of the plea agreement entered into between the State and Johnson. Defendant argues that he has met the requirements for standing in that he has demonstrated an injury to a legally cognizable interest, that the injury is traceable to the State's actions and that it is substantially likely to be redressed. See *Village of Chatham v. County of Sangamon*, 216 Ill. 2d 402, 419-20 (2005). Specifically, defendant asserts that the State's use of Johnson's testimony against him, procured through a plea agreement containing a consistency clause, violated his legally cognizable interest in due process and a fair trial. The majority, however, never squarely addresses defendant's contention in the context of the specific facts of this case. Instead, my colleagues generally state that "[a]bsent due process concerns, the validity of a plea agreement is generally governed by contract law." 236 Ill. 2d at 9. They then note that under general contract principles there is a strong presumption that the agreement benefits the parties to it and not a third party, and that this presumption may only be overcome by showing that the parties to the agreement had an affirmative intent to benefit the third party. The majority then summarily states that under these contract principles, defendant "lacks standing to argue that the agreement was invalid." 236 Ill. 2d at 10.

Although the majority notes the general rule that contract provisions govern plea agreements "absent due

process concerns," and strictly confines its discussion of standing to an application of contract principles, it is precisely the aforementioned "due process concerns" which animate defendant's argument and which are not addressed by the majority's opinion. The arguments raised by defendant implicate more than simple citation to general contract principles. As defendant notes, this court has previously observed in a related context that the underlying "contract" right in plea bargains are "constitutionally based and therefore reflect[ ] concerns that differ fundamentally from and run wider than those of commercial contract law," and that, because of this, "the application of contract law principles to plea agreements may require tempering in some instances." *People v. Evans*, 174 Ill. 2d 320, 326-27 (1996). I am unconvinced by the majority's terse analysis that no considerations other than those of contract law come into play under the specific facts presented here.

In addition, the majority gives short shrift to defendant's argument questioning the authority of both the State and the circuit court to erase a jury conviction for double murder 13 years after its entry. According to defendant, upholding the plea bargain between Johnson and the State under the specific circumstances presented in this case is tantamount to holding that the State has the absolute authority to overturn a jury verdict of guilty. Defendant explains that this occurs through the offer of a plea bargain wherein the State determines which of various statements made by a witness are "true," and then compels that witness to adhere to these statements throughout his testimony under the requirements of the consistency clause. In addition, defendant argues that the circuit court lacked jurisdiction to vacate Johnson's two jury convictions, entered 13 years earlier.

In its opinion, the majority briefly references "defendant's argument that the State lacked the authority to

enter into a plea agreement with Johnson," and immediately finds it "unavailing." 236 Ill. 2d at 10. The majority disposes of defendant's serious contentions in one sentence, holding that "[u]nder the revestment doctrine, litigants may revest a trial court with personal and subject matter jurisdiction, after the 30-day period following final judgment, if they actively participate in proceedings that are inconsistent with the merits of the prior judgment." 236 Ill. 2d at 10.

In *People v. Flowers*, 208 Ill. 2d 291 (2003), this court clearly stated that "[t]he jurisdiction of trial courts to reconsider and modify their judgments is not indefinite," and held that a trial court normally loses jurisdiction to vacate or modify its judgement 30 days after entry of that judgment, unless a timely postjudgment motion is filed. *Flowers*, 208 Ill. 2d at 303. We further held that "[l]ack of subject matter jurisdiction is not subject to waiver [citation] and cannot be cured through consent of the parties [citation]." *Flowers*, 208 Ill. 2d at 303. Although we were not called upon to directly address the continued vitality of the revestment doctrine in *Flowers*, the unequivocal language in that opinion has caused our appellate court to question whether the revestment doctrine remains valid. See *People v. Price*, 364 Ill. App. 3d 543, 546-47 (2006) (although leaving open the question of whether the revestment doctrine survived *Flowers*, the court noted that *Flowers* was "consistent with the maxim that a party may not waive an objection to subject matter jurisdiction").

Although the majority in its opinion summarily holds that the revestment doctrine bestowed upon the parties and the circuit court the authority to wipe away Johnson's prior double murder convictions 13 years after their entry and allow him to plead guilty to one count of murder and a reduced sentence, I note that my colleagues cite to the appellate court decision in *People v. Minniti*,

373 Ill. App. 3d 55 (2007), for direct support of this holding. The *Minniti* decision itself discusses the uncertainty within the appellate court regarding the continued vitality of the revestment doctrine subsequent to our decision in *Flowers*. *Minniti*, 373 Ill. App. 3d at 65-66. Ultimately, after examining the history and purposes of the revestment doctrine, *Minniti* concludes that "the revestment doctrine remains intact" after *Flowers*. *Minniti*, 373 Ill. App. 3d at 66.

It is curious that the majority relies upon the appellate court's decision in *Minniti* for direct support of its application of the revestment doctrine in the instant appeal. As stated, *Minniti* struggled to interpret the impact of our decision in *Flowers* upon the continued vitality of the revestment doctrine, and concluded, based upon a review of our prior case law, that the doctrine of revestment could be reconciled with *Flowers*. It is my position that it is the duty of this court to reconcile its own decisions, and that we should speak directly to the bench and bar as to the reasoning for doing so, and not indirectly through citation to an appellate court decision which attempts to divine the intent of this court. The majority's one-sentence statement regarding the revestment doctrine, and its citation to this appellate court decision in support of its holding, does nothing to reconcile the language in *Flowers*—which is contrary to the revestment doctrine—and also does not answer the fundamental question raised by defendant in the matter before us as to the authority of the State and the circuit court to nullify a jury verdict entered over a decade ago. Finally, I note that even if there were no question concerning the vitality of the revestment doctrine, there remains a question as to whether it applies under the unique facts of this case. In *Minniti*—the case cited by the majority in support of its holding—the revestment doctrine was applied to revest the circuit court with jurisdiction to hear

a postjudgment motion which was untimely by *eight days*. *Minniti*, 373 Ill. App. 3d at 64. Here, the majority revests the circuit court with jurisdiction *13 years* after entry of Johnson's conviction. I question whether the purposes and principles underlying the revestment doctrine may be stretched that far.

After determining that defendant does not have standing to challenge the plea agreement between the State and Johnson, the majority further holds that *even if* he did have standing, defendant's arguments would fail. Defendant contends that his right to due process and a fair trial includes the right to be tried on competent evidence. Although the majority acknowledges that "accomplice testimony by its nature is fraught with serious weaknesses" (236 Ill. 2d at 16), it dismisses defendant's assertion that the testimony offered by Johnson against him is especially suspect because Johnson's plea agreement with the State required that his testimony be consistent with certain of his prior statements, statements which Johnson had, in fact, previously contradicted under oath. Specifically, after his arrest in 1989, Johnson had initially provided statements to law enforcement officers in which he denied any involvement in the crime. Subsequently, however, Johnson provided an inculpatory statement which also implicated defendant. Before his trial, Johnson again changed his position and filed a motion to suppress his inculpatory statement, and testified under oath that he did not understand the concept of *Miranda* rights, was not given *Miranda* rights, did not provide the information that was contained in his confession, and did not remember making the confession.

Defendant underscores that pursuant to the terms of the plea agreement between the State and Johnson, Johnson's testimony was required to be consistent only with those statements wherein he implicated defendant, despite the fact that Johnson himself testified under oath

at his suppression hearing that he did not make those same statements. Defendant further contends that, although the plea agreement required that Johnson's testimony be "truthful," it is difficult to ascertain under the facts presented what exactly the "truth" is. According to defendant, the *State* has made the determination that the "truth" equates with the contents of certain prior statements made by Johnson. However, defendant contends, the State thereby improperly places itself in the position of the trier of fact in making that determination. Defendant maintains that the State has no crystal ball to know what the "truth" is—it only knows what statements are consistent.

Defendant further argues that the effect of the plea agreement was to place Johnson under an extremely strong compulsion to testify against defendant in a particular manner in an effort to please the State. Defendant asserts that once he was granted a new trial due to the recantation by the State's key witness at the first trial, the State was desperate to obtain Johnson's testimony, which was the only direct evidence against defendant at the second trial. In order to do so, defendant maintains that the State had to offer Johnson an agreement he would find difficult to refuse. In exchange, Johnson had to testify in such a way that would ensure that defendant would be convicted, or Johnson would himself return to facing life in prison. According to defendant, when a witness is presented with such a situation, the testimony of that witness will, by necessity, conform to what is dictated by the State. Defendant concludes that this amounts to Johnson delivering "scripted" testimony which is inconsistent with the search for the truth and impugns the integrity of the justice system.

The majority fails to squarely address defendant's contentions. Rather, my colleagues examine case law

from other jurisdictions and draw support from those decisions for its conclusion that the plea agreement between the State and Johnson did not violate defendant's rights because even though Johnson agreed that his testimony would be consistent with certain prior statements he had made, it also required that the testimony be "truthful." A closer examination of the cases relied upon by the majority, however, undermines support for its holding, as these decisions upheld plea agreements containing consistency clauses in situations factually distinguishable from the matter at bar.

In *State v. Bolden*, 979 S.W.2d 587 (Tenn. 1998), a codefendant was offered a plea agreement whereby in exchange for his testimony against the defendant, he would receive a reduced sentence. There, the agreement provided:

"If [the codefendant witness] testifies truthfully as to [defendant's] involvement in the murder of [the victim] and as he stated in his statement to [law enforcement] on 3/21/94 at 6:05 p.m. and as to threats made to him by [defendant] then [the State] will offer a plea to 2d Degree Murder, Range I, judicial sentencing." *Bolden*, 979 S.W.2d at 589.

The court held that because the agreement "hinged upon truthful testimony" (*Bolden*, 979 S.W.2d at 592), it did not require that the witness testify in accordance with a particular script.

Similarly, in *People v. Jones*, 236 Mich. App. 396, 600 N.W.2d 652 (1999), witnesses against the defendant were granted "use" immunity in exchange for their testimony against him. There, the agreements provided:

"IN THE MATTER OF [Witness], that if [Witness] provides a truthful statement to the Detroit Police Department concerning his knowledge of the killing of [the victim] and testifies truthfully in all trials, proceedings and hearings in connection with that killing the Wayne County Prosecutor's Office will not use [Witness'] testimony to bring charges against him." *Jones*, 236 Mich. App. at 399, 600 N.W.2d at 654.

The court upheld the agreement, noting that although the immunity agreements provided "some incentive" for the witnesses to conform their testimony at trial to their prior accounts, it was "not persuaded that the agreements rendered the witnesses' testimony so tainted as to be inadmissible." *Jones*, 236 Mich. App. at 406, 600 N.W.2d at 657.

In the instant appeal, Johnson had been incarcerated for over a decade for double murder when he was approached by the State with a plea agreement encouraging him to testify against defendant; no similar fact pattern exists in either *Bolden* or *Jones*. Further, in both *Bolden* and *Jones*, the terms of the plea agreements differ in significant respect from that in the matter at bar, as neither contained a provision such as here which required that the witness must not only testify "truthfully," *but also* that his testimony *"shall"* be consistent with certain of his prior statements. Further, there is no indication in either of these cases that the witnesses had a history of inconsistent statements under oath, as does Johnson. Finally, it does not appear that the witnesses in those cases received the extent of benefits offered to Johnson in exchange for his testimony, including the nullification of a jury verdict and the erasing of a conviction, reduction in sentence, and a transfer from a super-maximum security facility to a lower-security facility. Because the cases relied upon by the majority are factually distinguishable, I do not find them supportive of its holding that the plea agreement here was unobjectionable and that such agreements should be condoned in the future under Illinois law.

For the foregoing reasons, I cannot join the majority's opinion.

JUSTICES KILBRIDE and BURKE join in this dissent.