# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Pikes*, 2012 IL App (1st) 102274

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH PIKES, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-10-2274 |
| Rule 23 Order filed<br>Rehearing denied<br>Rule 23 Order withdrawn<br>Opinion filed | June 28, 2012<br>September 25, 2012<br>September 25, 2012<br>September 27, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first degree murder in a gang-related shooting was reversed on the ground that the trial court erred in admitting evidence of another shooting that occurred a few days before the charged crime, since there was no evidence that defendant had any part in the prior shooting or was even present. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-13128; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Reversed and remanded for new trial. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and S. Amanda Ingram, all of
State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Jon
Walters, and Charles J. Prochaska, Assistant State's Attorneys, of
counsel), for the People.

Panel

JUSTICE FITZGERALD SMITH delivered the judgment of the court,
with opinion.
Presiding Justice Lavin and Justice Sterba concurred in the judgment and
opinion.

# OPINION

¶ 1      Following simultaneous but separate jury trials with codefendant Lamont Donegan
(codefendant),[1] defendant Keith Pikes (defendant) was convicted of first degree murder and
sentenced to 27 years in prison. He appeals, contending that the trial court erred in several
respects, including in admitting other crimes evidence where there was no proof that he was
involved in that crime, in admitting the hearsay statement of the nontestifying codefendant
that was not made in furtherance of a conspiracy, and in allowing the State to introduce
inculpatory statements of recanting witnesses that were redundant. He asks that we reverse
his conviction and remand his cause for a new trial. For the following reasons, we reverse
and remand.

¶ 2                                    BACKGROUND

¶ 3      The instant cause involved incidents related to the shooting death of the victim, Lorne
Mosley, on August 21, 2006.

¶ 4      Prior to trial, the State made several motions. In one of these, entitled "Motion to Admit
Proof of Other Crimes/Other Bad Acts," the State sought to introduce evidence against both
defendant and codefendant of a prior shooting committed by codefendant. As described in
that motion, in the days prior to the instant murder, Quentez Robinson, a member of the
Gangster Disciples street gang, was riding a motor scooter when codefendant, a member of
the Four Corner Hustlers street gang, shot at him. Immediately thereafter, a car driving
behind Robinson's scooter struck codefendant. Defendant argued that this evidence should
not be admitted as to him, since he was not present when it occurred. While acknowledging

---

[1]Codefendant is not a party to this appeal.

-2-

that it was "unaware of any evidence that [defendant] was present at the time of the shooting," the State argued that this incident was relevant and admissible against both defendant and codefendant to show motive in the instant murder. Following argument, the trial court agreed with the State and admitted evidence of the incident against defendant and codefendant, finding that it was "extremely relevant[,] by far more probative than prejudicial" and "[w]ill help the jury understand the context" of the instant cause.

¶ 5     In another motion, the State moved to admit several hearsay statements against defendant made by codefendant after the shooting at issue, pursuant to the coconspirator exception to the hearsay rule. Specifically, the State sought to introduce codefendant's statements, made in the presence of defendant and Deangelo Coleman, that "we got one last night" and "its about time they got one," along with codefendant's description of the events immediately prior to the murder, namely, that he and defendant drove slowly on Corliss Avenue near some Gangster Disciples, with defendant behind the wheel; that he shot outside his window from the car; that he had wanted to shoot at the Gangster Disciples on foot but that his foot had been injured; and that he wanted revenge for his injury. Defendant argued that there was not sufficient evidence of a conspiracy to support the admission of these statements against him. Again, following argument, the trial court agreed with the State and admitted the evidence, finding that it was "extremely relevant" and "more probative than prejudicial," and that "the jury has a right to hear some context to what may have happened."

¶ 6     The cause then proceeded to trial. Quentez Robinson testified that in the summer of 2006, he was a member of the Gangster Disciples, as were his friends Herbert Lemon and Brandon Merkson. Their territory encompassed an area on Corliss Avenue between 103rd and 106th Streets; at 106th Street, the territory belonged to the Four Corner Hustlers, their rivals, to which defendant and codefendant belonged. Robinson confirmed that the two gangs were in a feud. He testified that on August 18, 2006, he was riding his friend Cairo's scooter when he rode it into Four Corner Hustlers' territory. Following him in a car were Cairo, Lemon and Merkson. Robinson averred that, once in rival territory, codefendant ran out of an alley and shot at him four times. Robinson did not report this incident to police. Robinson further testified that, a few days later, on August 21, 2006, he was outside on Corliss Avenue with Merkson, Cairo, Lemon, Lawanda Hamilton, her young daughter and the victim when he saw a silver, box-type car driving toward them with the back window down. Robinson then saw a hand stick out of the window and start shooting. Robinson stated that he heard between 12 and 15 shots from what he believed were two different guns. Robinson ran and jumped to the ground; he did not see who was shooting. When he got up, he saw that the victim had been shot.

¶ 7     Lemon testified that he is a member of the Gangster Disciples and that the Four Corner Hustlers are a rival gang. He averred that Robinson and Merkson were his friends and fellow Gangster Disciples, while he knew Vernard Crowder, Deangelo Coleman, codefendant and defendant to be members of the Four Corner Hustlers. Lemon recounted that, a day or two before the murder, Robinson was riding Cairo's scooter through Four Corner Hustler territory when codefendant shot at him. Lemon averred that, at the time, he was in a car driving behind Robinson with Cairo and Merkson and, immediately after the shooting, that

car struck codefendant. Lemon further testified that, on the night of the shooting, he was with Robinson, Merkson, Hamilton and the victim on Corliss when he saw a gray, box-type car coming toward them. Someone then shot from the car, and Lemon took cover by a tree. Lemon stated that he was able to see inside the car and recognized defendant and codefendant inside; codefendant was in the passenger seat and defendant was driving. Lemon testified that he saw both these men shooting as the car drove past. When the group came back together, Lemon saw that the victim had been shot and was lying on the ground. Lemon did not meet with police right away. However, when he eventually did, he picked defendant out of a photo lineup and identified him to police as the driver of the car and as one of the shooters; he also picked codefendant out of a separate lineup and identified him to police as the passenger and as the other shooter.

¶ 8        Vernard Crowder testified that he knew defendant and codefendant from the neighborhood, but denied that he or they were members of a street gang. He further testified that on the night of the shooting, he went to the store and then to his godmother's house and did not recall anything unusual happening; he denied seeing defendant or hearing any gunshots. He admitted that, a few months later, he spoke to police and to Assistant State's Attorney (ASA) Aiden O'Connor about the shooting. He averred that they told him to say exactly what another witness had said regarding the shooting or they would "charge" him, and that they "forced" his signature to a written statement. Crowder described that in April 2009, he testified before a grand jury regarding the shooting but that he did so only because these authorities promised to drop a domestic battery charge against him. He then denied essentially all his grand jury testimony, including that defendant was a member of the Four Corner Hustlers and that he saw him everyday; that codefendant was also a member of that gang; that Goldie Richardson was a member of a friendly gang known as the Black Souls and that these two gangs were rivals of the Gangster Disciples; that he (Crowder) had a conversation with defendant shortly before the shooting; that he heard gunshots soon thereafter; that he had a conversation with Coleman a few days later; that he was with codefendant when the police came to arrest him and recovered the murder weapon; and that he had a conversation with defendant wherein defendant told him he was angry about previously having been shot.

¶ 9        ASA O'Connor testified that she met with Crowder in January 2008, whereupon he agreed to give a handwritten statement to her and police. In his statement, Crowder explained that, while he is not in a gang, most of his friends are. He stated that, on August 20, 2006, he was going to his godmother's house when he saw defendant standing near an older model Toyota and saw codefendant inside the car cleaning it, along with Richardson. Crowder described that defendant asked him if he wanted to "go do business" with the group on Corliss, but Crowder declined. Crowder went to his godmother's home, and when he returned outside, the group was gone. He then heard gunshots coming from Corliss. Crowder's statement also averred that, two days later, he was in a gangway with codefendant and others when police arrived; as he and codefendant ran, codefendant fell and tossed a .45-caliber High Point handgun into a yard. Crowder stated that he saw defendant again in the fall of 2007, whereupon defendant complained to him that "if every one had kept up what

-4-

he did on Corliss when the shooting occurred the trouble wouldn't have continued."

¶ 10    ASA Krista Peterson testified that she met with Crowder in April 2009, along with police detectives, and she presented his testimony before the grand jury. At the grand jury hearing, Crowder testified in line with his statement to ASA O'Connor and police. He again confirmed that both defendant and codefendant were gang members and that there was a gang war between their gang and the Gangster Disciples, stemming from the killing of one of their members by a Gangster Disciple. Regarding August 20, 2006, Crowder testified that, while he was walking from the store to his godmother's house, he saw defendant standing by a "greyish black" car, with codefendant inside cleaning it out. Defendant called over to Crowder and asked him if he wanted to go with them to "handle some business," which Crowder knew meant harming someone in the rival gang. Crowder stated that he declined because he was on probation; at that time, Richardson arrived and joined defendant and codefendant. Crowder continued on to his godmother's home, and when he came back outside to sit on the porch, he saw that defendant, codefendant and Richardson were gone. Shortly thereafter, Crowder heard about 10 gunshots coming from Corliss. Crowder further testified before the grand jury that, a few days prior to the shooting, codefendant had been hit by a car containing Gangster Disciples and was mad about the incident. Crowder then testified that he was with Coleman and codefendant a few days after the shooting when codefendant told him that he could not get caught with the gun he had with him because "it had a body on Corliss." Crowder stated that he knew this meant that codefendant had used the gun, which was a .45-caliber High Point, to kill the victim. While they were talking, police arrived; as they ran, codefendant fell in front of Crowder, whereupon the ammunition clip fell out of the gun and codefendant threw the gun away. Finally, Crowder testified before the grand jury that he saw defendant in the fall of 2007, and that defendant told him he was "mad at the fact that he ended up being shot" during another incident, complaining " 'Why ain't nobody keeping going over there, finishing what he had left off with,' " which Crowder knew referred to the murder of the victim.

¶ 11    Merkson testified that he is a member of the Gangster Disciples, as are Lemon, Robinson and Cairo, and that his gang was feuding with the Four Corner Hustlers. He averred that, in August 2006, he was in the car following Robinson, who was riding a scooter, when a person he could not identify ran into the street and began shooting at Robinson. The car that Merkson was in then approached and bumped the shooter, who fell to the ground. Merkson denied telling police that the shooter was codefendant, though he admitted that he had written this in a statement to police and had testified before the grand jury that it had been codefendant. Regarding the night in question, Merkson testified that he was standing on the sidewalk with the victim and others when he saw a gray, box-type car approaching them; the car slowed down and then its occupants began shooting. Merkson was able to see inside the car and recognized codefendant, who was shooting, but could not see the driver.

¶ 12    Coleman testified that he knew all the witnesses to the shooting in question and knew that there had been a shooting, but that he was not a gang member and never heard anything about the shooting. He also denied having any conversations with defendant or codefendant before the shooting, or seeing them on that night. He further denied that he, defendant and

codefendant were members of the Four Corner Hustlers; that they were at war with the Gangster Disciples; and that there was any incident involving a scooter in the days prior to the shooting. While he testified that he spoke with an ASA and gave a handwritten statement to police, he denied telling the ASA anything in that statement.

¶ 13     ASA O'Connor published Coleman's handwritten statement to the jury. In that statement, Coleman acknowledged that he, defendant and codefendant were members of the Four Corner Hustlers and that their gang was at war with the Gangster Disciples because one of their members named Victor had been killed by that rival gang. Coleman's statement also described the motor scooter incident. On that day, Coleman was at a party across from a liquor store when he heard gunshots. He ran outside and saw codefendant lying in the street. Codefendant told him he had just shot at Robinson, who had ridden by on a scooter, with his .45-caliber High Point handgun and that a car following Robinson then hit him, knocking him to the ground. Coleman stated that he then saw defendant and codefendant the next day and, during a conversation, codefendant said that someone had to pay for the scooter incident and that he was going to kill a Gangster Disciple. Coleman's statement further described the shooting on August 20, 2006. He stated that he saw defendant and codefendant cleaning garbage out of an older, gray-colored Toyota which defendant had just been driving; he had heard defendant say that he was going to steal a car that could be used for killing a Gangster Disciple. Coleman described that codefendant had his .45-caliber High Point with him, and defendant had a .40-caliber handgun which was the "Nation gun" belonging to the gang; he saw codefendant put the guns in the car. Then, defendant got in the driver's seat, codefendant got in the passenger seat, and Richardson, who had arrived to join them, got in the backseat of the car. After defendant and codefendant had talked all day about getting "pay back," the group then left.

¶ 14     Coleman's handwritten statement further described that he saw defendant and codefendant the day after the shooting and they both talked to him about having shot the victim. Defendant explained how he and codefendant had driven around before going onto Corliss, that there were a lot of people outside, that they drove slowly down the block and that they shot at the people. Codefendant described the same events to Coleman and told him that they "got one last night. About time we got one." Codefendant also discussed that he had wanted to do the shooting on foot, but could not because his foot had been injured in the scooter incident, for which he was seeking revenge. Coleman further described that, the next day, he was with codefendant and other gang members in an alley when police arrived; as everyone ran, codefendant fell and the .45-caliber High Point he used in the shooting came out of his waistband. Coleman saw codefendant throw the gun away.

¶ 15     ASA Jose Villareal testified that he met with Coleman and presented him as a witness before the grand jury. ASA Villareal testified that, at the grand jury hearing, Coleman testified that he was a member of the Four Corner Hustlers and that his gang was at war with the Gangster Disciples because they had killed a member of his gang named Victor. Coleman stated that, on August 19, 2006, he was at a party when he heard shots. He then saw codefendant on the street, who told him he had just been hit by a car after having shot at a Gangster Disciple who had ridden by on a scooter. Coleman described that codefendant was

very upset and wanted retaliation. Coleman saw codefendant the next day, and codefendant told him he was going to steal a car so he could go kill a Gangster Disciple, along with defendant. Coleman recounted to the grand jury that, later that night, he saw defendant in a silver car pull up by codefendant, and the two began cleaning out the car. Codefendant left and then returned with his .45-caliber High Point handgun and a .40-caliber gun, known as the "Nation gun" used by the gang. Once Richardson arrived, codefendant said, "it's time," and the three men left in the silver car; defendant was driving, codefendant was in the passenger seat and Richardson was in the back. Coleman further testified that, the next day, he heard that the victim had been murdered; he knew the victim to be a Gangster Disciple. Coleman recounted that, later, he, codefendant and defendant had a conversation about the shooting. During this conversation, codefendant told him that "one of them n*ggers got it last night and it was about time we got one." Codefendant also described how he, defendant and Richardson committed the shooting, explaining that they originally had planned to chase the Gangster Disciples on foot, but defendant instead drove the silver car slowly down the block and he and Richardson leaned out the windows and shot at the group as they ran. Finally, Coleman told the grand jury that, a day or so later, he was with codefendant and others when police pulled up, the group ran, and codefendant dropped his gun, which police recovered.

¶ 16    Regarding the physical evidence in this cause, police officer Mark Reno testified that, in late August 2006, he and fellow officers were investigating the victim's murder when, while driving by an alley, several young men in a group began to run. As officers chased and detained them, Officer Reno recovered a loaded .45-caliber semiautomatic handgun and an ammunition clip that had been thrown by one of them. Forensic testing on the multiple shell casings, bullets and bullet fragments recovered from the scene of the murder matched the .45-caliber handgun recovered by Officer Reno, and it was determined that all of the .40-caliber shell casings, bullets and bullet fragments recovered from the scene were fired from the same .40-caliber weapon, which had not been recovered. Briefly, Detective Brian Forberg testified that, as the leader of the investigation, he met with and interviewed several of those involved, including Coleman, Crowder, Robinson, Lemon and Merkson. While Robinson could not identify anyone from the silver car on the night of the shooting, Merkson was able to identify codefendant as the shooter. Detective Forberg further testified that Coleman, Crowder and Lemon all clearly identified defendant and codefendant as participants in the shooting.

¶ 17    After the State rested its case-in-chief, defendant moved for a directed verdict, which was denied. Following the State's closing argument, defendant chose to waive his. The jury then found him guilty of first degree murder and not guilty of personally discharging a firearm.

¶ 18                                            ANALYSIS

¶ 19    Defendant presents three issues on appeal, all dealing with asserted errors committed by the trial court. The first deals with the court's admission against him of "other crimes evidence," namely, the scooter shooting incident; the second involves the court's admission of codefendant's hearsay testimony pursuant to the coconspirator exception to the hearsay

rule; and the third focuses on the court's admission of redundant recanting witness testimony.

¶ 20     However, because we agree with defendant's first contention that the trial court erred in admitting the other crimes evidence as against him during trial and, thus, that reversal and remand are required here, we turn our attention to this first issue only and we need not address the remaining two on appeal.

¶ 21     As defendant notes, prior to his simultaneous but separate trial with codefendant, the State presented a motion to the court entitled "Motion to Admit Proof of Other Crimes/Other Bad Acts." In this motion, the State sought to introduce evidence against both defendant and codefendant of codefendant's shooting at Robinson after Robinson rode into rival gang territory on a scooter. While the State devoted the majority of its motion to describing the incident and explaining how it was relevant and admissible to show codefendant's "motive, intent, identity, knowledge, opportunity, and absence of mistake" in shooting the victim, it summarized its potential admissibility as against defendant by stating that this evidence "should also be admissible against" him because it is "relevant to provide a context to [defendant's] actions and words before the murder." The only elaboration the State provided regarding the relationship between this evidence and defendant was that the State was "unaware of any evidence that [defendant] was present at the time" of the scooter shooting.

¶ 22     When the State presented this motion during the pretrial hearing, it told the court that the scooter shooting should be admitted against codefendant as a prior crime/bad act because he committed the shooting and was then struck by a car, all leading to his "statements of revenge" immediately before the murder in question. The State then went on to add that evidence of the scooter shooting should also be admitted against defendant because he, too, "start[ed] to make statements of revenge." Defendant objected, pointing out to the court that he was not present at the scooter shooting, nor was he hit by the car. The court, acknowledging that the scooter shooting "didn't directly impact him," turned to the State and summarized its argument that, because of gang affiliation, defendant "felt revenge was required also." Defendant began to argue that this was "unreliable hearsay and not competent evidence" when the court interrupted to again confer with the State. After its discussion with the State, the court described that the evidence of the scooter shooting was "reliable enough," that it "meets the test to resolve the motion *in limine*," and that it was "by far more probative than prejudicial." Accordingly, the court overruled defendant's objection, concluding that the scooter shooting was "extremely relevant" to "help the jury understand the context that of which [*sic*] the Government suggest[s]," and admitted the evidence against both defendant and codefendant.

¶ 23     On appeal, defendant contends that the trial court erred in admitting evidence of the scooter shooting as against him primarily because he was neither present at nor involved in this "other crime/bad act." Noting the State's failure to make a threshold showing that he participated in the crime as required by the controlling case of *People v. Thingvold*, 145 Ill. 2d 441 (1991), he argues that the court's error in admitting the evidence was highly prejudicial, requiring reversal of his conviction and remand for a new trial. We agree.

¶ 24     It is well established that evidence of other crimes or bad acts for which a defendant is

not on trial is inadmissible against him if relevant merely to show his propensity to commit crimes. See *Thingvold*, 145 Ill. 2d at 452; accord *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010). However, such evidence is admissible if it is relevant for another purpose, such as to prove the defendant's motive in the charged crime, or his intent, identity, *modus operandi*, or absence of mistake related to that crime. See *Thingvold*, 145 Ill. 2d at 452 (this evidence can be admitted as long as relevant to any material question regarding the charged crime other than propensity); accord *Dabbs*, 239 Ill. 2d at 283. When such evidence is offered, the trial court must consider the relevance of the evidence for the purpose offered as weighed against the prejudicial impact it could have on the defendant. See *Thingvold*, 145 Ill. 2d at 452. Thus, even if it is offered for a permissible purpose, the other crimes evidence will not be admitted if its prejudicial effect outweighs its probative value. See *Dabbs*, 239 Ill. 2d at 284.

¶ 25    Significantly, while a defendant's bad character is not wholly irrelevant to the charges he faces, our courts have nonetheless established these particular rules regarding the admissibility of other crimes evidence because of the very nature of this evidence. See, *e.g.*, *Dabbs*, 239 Ill. 2d at 284. Precisely because this evidence involves one's prior bad acts, even criminal acts, there is a great concern that such evidence will "overpersuade[ ] the jury," which may convict the defendant only because it believes he committed these other acts or it feels he is otherwise a bad person deserving of punishment. See *Thingvold*, 145 Ill. 2d at 452; see also *Dabbs*, 239 Ill. 2d at 284 (even otherwise relevant other crimes evidence may be excluded due to concerns regarding the danger of unfair prejudice, the jury's confusion of the issues, extraneous topics misleading the trier of fact, and the needless presentation of cumulative evidence).

¶ 26    Therefore, and because of such concerns, it has become axiomatic that among the precautions for the admission of other crimes evidence against a defendant is that the State is required to, before any consideration may be given to that evidence, first show that "a crime took place and that *the defendant committed it or participated in its commission*." (Emphasis in original.) *Thingvold*, 145 Ill. 2d at 455 (the State must show this before the other crimes evidence can be considered for its admissibility); accord *People v. Gwinn*, 366 Ill. App. 3d 501, 515 (2006); *People v. Harris*, 297 Ill. App. 3d 1073, 1085 (1998). This showing need not be beyond a reasonable doubt, but the proof of the defendant's commission or participation must at the very least constitute more than a mere suspicion. See *Thingvold*, 145 Ill. 2d at 455; *Harris*, 297 Ill. App. 3d at 1085.

¶ 27    Accordingly, then, in the instant cause, before the trial court made any consideration regarding the prejudicial impact of the scooter shooting with respect to its probative value as it related to defendant's trial, it was required to first certify that the State met its burden to show that defendant somehow participated in that incident. While the State did not have to prove this beyond a reasonable doubt, it needed to provide at least some evidence of defendant's involvement beyond a mere suspicion. Without this, the other crimes evidence could not be properly admitted at trial as to defendant.

¶ 28    Here, the record is clear, and the State itself admitted to the trial court at the outset during the pretrial proceedings, that it had no evidence that defendant was even present at the

scooter shooting, let alone that he was involved or participated in it. Rather, the State proffered that the only link between the scooter shooting and defendant was that defendant allegedly made some remarks about it after it happened. Under the legal principles discussed above, such a tenuous connection between the scooter shooting and defendant did not justify the admission of this other crimes evidence, committed solely by codefendant, against defendant. As such, the only thing this evidence did was invoke the exact concerns regarding other crimes evidence our courts have warned about, namely, the overpersuasion of the jury, as well as confusion and unfair prejudice. Simply put, the trial court's consideration of this other crimes evidence–its purpose, probative value, etc.–was premature and irrelevant; the State never met its burden to prove, even under the mere suspicion standard, that defendant participated in the scooter shooting, which involved only codefendant.

¶ 29    For its part, the State argues that the admission of the scooter shooting against defendant was not erroneous because it was not offered as other crimes evidence but, rather, only as "relevant evidence" of defendant's motivation in the victim's murder. The State hinges its assertion on the notion that, as the court stated, evidence of the scooter shooting provided a background and context for the jury in which to view defendant's words and actions regarding the crime charged.

¶ 30    The State's argument here ignores the law, misses the mark regarding the facts of the instant case, and attempts to set a dangerous precedent. First, its assertion that defendant is somehow mischaracterizing the scooter shooting as other crimes evidence is wholly belied by both the record in this cause and common sense. To the contrary, the evidence of the scooter shooting exemplifies the definition of other crimes evidence. That is, it is evidence of an uncharged crime, *i.e.*, codefendant's shooting at Robinson from an alley on August 19, 2006, other than the crime charged, *i.e.*, the shooting death of victim Mosley on Corliss days later, sought to be introduced against defendant at his trial. See *People v. Cruz*, 162 Ill. 2d 314, 348 (1994) ("other crimes evidence" is "evidence of offenses other than those for which a defendant is being tried"); *People v. Bobo*, 375 Ill. App. 3d 966, 971 (2007) (other crimes evidence includes "evidence of offenses, acts, and wrongs other than those for which [the] defendant is being tried"); see also *People v. Ingram*, 389 Ill. App. 3d 897, 901 (2009) (other crimes evidence defined as evidence "that suggests that the defendant has engaged in prior criminal activity or is intending to engage in criminal activity"). We would be hard-pressed to find a better example of this concept than the instant situation. Moreover, at every turn in the legal proceedings against defendant, the State itself labeled the scooter shooting as other crimes evidence. From the very title of its pretrial motion seeking the admission of this evidence against defendant at trial, calling it "Motion to Admit Proof of Other Crimes/Other Bad Acts," to its repeated arguments before the trial court, the record unmistakably demonstrates that the State was presenting the admission of the scooter shooting as the admission of other crimes evidence. And, in response, the trial court treated it as such, proceeding to conduct the weighing of factors we have discussed concerning the admission of other crimes evidence when, as exhibited by its colloquy, it concluded that the evidence was "reliable enough," that it met "the test," and that it was "by far more probative than prejudicial."

¶ 31    Second, the State's argument misses the mark in relation to the facts and applicable law of the instant cause. Again, before the admission of other crimes evidence at trial may even be considered, it must first be shown that the defendant committed the previous crime. This fundamental concept presents a threshold requirement that cannot be bypassed. See *People v. Phillips*, 127 Ill. 2d 499, 520 (1989) ("whether a crime occurred in which the defendant participated" is "[t]he threshold question" when it comes to the admissibility of other crimes evidence at trial). Accordingly, before a trial court may consider the factors of admissibility pertaining to the other crimes evidence, such as probative value versus prejudicial impact, similarities between the crimes, or the purpose for which the evidence is offered (motive, identity, *modus operandi*, etc.), the threshold requirement must first be met. In other words, one does not get to the evaluation of other crimes evidence unless and until it is first shown that the defendant was involved or participated in that other crime. Here, the threshold requirement was never met and, thus, the trial court's findings were premature. Instead, what occurred here was that defendant, whom the State admitted was not present at the time of the scooter shooting nor did it even argue that he knew it was going to happen, was sent to trial with the stigma overhead of a previous crime which he did not commit.

¶ 32    Lastly, we note that the State's insistence that the scooter shooting was merely "relevant evidence" and, therefore, was properly admitted to provide background and context for the jury is entirely misplaced. In its brief on appeal, the State writes that "[a]ny relevant evidence may be offered to show motive, regardless of whether it is 'other crimes' evidence." However, the State provides absolutely no legal citation for this assertion. To the contrary, we have noted throughout our decision herein that our courts have undeniably made a distinction between simple, relevant evidence and the peculiar concerns that are involved in the consideration of other crimes evidence. See *Thingvold*, 145 Ill. 2d at 452; see also *Dabbs*, 239 Ill. 2d at 284. Again, the scooter shooting was not merely "relevant" evidence; it clearly is, and was presented as, other crimes evidence. Moreover, the State presents no legal precedent for its suggestion that the threshold requirements for the admission of other crimes evidence may be bypassed if, or as long as, the other crimes evidence provides a background or context for the crime charged. Again, to the contrary, the very fact that the scooter shooting may well have provided a certain "background" or "context" in this case against defendant, who was never a part of that prior crime, is what, in our opinion, creates frightening legal implications. Furthermore, the State's assertion that even if the trial court improperly admitted the evidence it constituted "harmless" error is unpersuasive. Not only does the State fail to elaborate on this comment in any way, but such a conclusion cannot be accepted in the instant cause. There was never any nexus shown between defendant and the scooter shooting, yet witness after witness testified before the jury as to the incident at his trial. To be made to bear even the slightest connection to a crime committed by another to which one did not even have forehand knowledge cannot be said to be harmless error. See *People v. Moore*, 2012 IL App (1st) 100857, ¶ 46 (" 'The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal.' " (quoting *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980))); accord *People v. Harding*, 401 Ill. App. 3d 482, 490 (2010) (conviction may be upheld where other crimes evidence was erroneously

admitted, but the record must show that there was no prejudice; otherwise, "[w]here the evidence is ambiguous as to the prejudicial effect of the erroneous admission of other crimes, the required showing has not been made, and the conviction must be reversed").

¶ 33    For the record, we wish to comment on the applicability of *People v. Young*, 263 Ill. App. 3d 627 (1994), to the instant cause. The State relies heavily on *Young* in support of its propositions on appeal. In that case, several gang members, tried together, were convicted of the first degree murder of a rival gang member named Dan Williams. At trial, the State presented evidence that rival gang members had, on a prior occasion, sexually assaulted defendant Young's girlfriend, as well as evidence that, on the night of the murder, the girlfriend identified to defendant Young and another defendant that one of her rapists was named "Williams." The State's theory was that the defendants killed Dan Williams in a case of mistaken identity to avenge the sexual assault of defendant Young's girlfriend by the rival gang members, one of whom was also named "Williams." See *Young*, 263 Ill. App. 3d at 632, 635.

¶ 34    The State posits that *Young* is similar to the instant cause because the trial court in that case allowed the evidence of the sexual assault–a crime committed by someone else–against the defendants. The State further notes that the defendants' challenges to the admission of that evidence failed on appeal, with the *Young* court upholding their convictions. However, *Young* is completely distinguishable, as the State misconstrues what occurred on appeal in that case. The defendants challenged the evidence on two fronts–neither of which involved the law of other crimes evidence applicable in the instant cause. First, the defendants in *Young* challenged the admission of evidence regarding their alleged gang membership, claiming that this was error and deprived them of a fair trial. In response, the *Young* court found that "[e]vidence of a defendant's gang affiliation and activity is admissible despite the possibility of prejudice as long as there is evidence linking such activity to the crime charged," since evidence of gang affiliation is admissible to provide a motive for an otherwise inexplicable act. *Young*, 263 Ill. App. 3d at 635. Therefore, evidence of the sexual assault, though not committed by the defendants, was properly admitted against them at trial to show their gang affiliation and, in turn, a motive for the charged murder. See *Young*, 263 Ill. App. 3d at 635. In the instant case, however, the State did not seek to introduce the scooter shooting as evidence of gang affiliation as the State did in *Young*, but, rather, as other crimes evidence against defendant. In fact, before the State argued its pretrial motion to admit the scooter shooting as other crimes evidence against defendant, it argued a motion to admit different evidence to show both defendant and codefendant's gang affiliation. The parties discussed it and the trial court ruled that this different evidence was allowable; that issue has not been appealed. What the State argued subsequently in its "Motion to Admit Proof of Other Crimes/Other Bad Acts" was not the same as in *Young*.

¶ 35    The only other way *Young* may provide a relevant comparison is the second avenue via which the evidence was challenged therein, which the State does not even mention in its brief before us. For the record, defendant Johnson, the only defendant who was tried separately, argued on appeal that certain evidence of prior crimes was erroneously admitted against him. This evidence was comprised of statements he made to police that, several hours before the

murder, he and the other defendants made plans to go "hunting" for the rival gang members who raped defendant Young's girlfriend for revenge, and evidence that they did in fact arm themselves with guns, shot a man named Rick James, and fled to an apartment where they remained for an hour or two before going out and murdering the victim. See *Young*, 263 Ill. App. 3d at 638. After considering the admissibility factors of other crimes evidence in relation to the evidence presented, the *Young* court found that it had been properly admitted by the trial court. See *Young*, 263 Ill. App. 3d at 639 (examining similarity of two crimes, the participants, etc.). However, this portion of *Young* does not aid the State in the instant cause. In fact, it illustrates our very point here. The defendant who challenged the other crimes evidence had admitted to police that he was involved and participated in the prior crime/bad acts. See *Young*, 263 Ill. App. 3d at 639. Thus, the threshold for the admission of the other crimes evidence against him had been met. As we have consistently pointed out, such was not the case herein. Accordingly, *Young* provides no support for the State's position.

¶ 36    Finally, the State directs us to *People v. Morales*, 2012 IL App (1st) 101911, a recent decision issued by a different division of this court, and urges us to make an exception to the established rules regarding other crimes evidence.[2] However, *Morales* is unmistakably distinguishable from the instant cause and the exception it carves out is, we believe, tenuous.

¶ 37    In *Morales*, the defendant was charged with the murder of the victim in the parking lot of a tortilla factory. At trial, amid evidence that the defendant and those present with him during the murder were members of a street gang, an eyewitness testified that, three weeks prior to the murder, he saw two or three individuals selling something in the factory parking lot. He then saw defendant, whom he had known from the neighborhood for five years, along with several other men he knew, attack these individuals; one of the individuals ran into the factory seeking refuge and was saved. The eyewitness further testified that, on the night of the murder, he heard the defendant's cousin, whom he also knew, speaking on a cell phone asking for help in beating up someone. The eyewitness averred that, soon thereafter, the defendant and four other men arrived; they gathered together, walked to the factory parking lot across the street and attacked the victim who was working there, beating him to death. Later, on cross-examination, the eyewitness admitted that he was not sure that the defendant was present in the factory parking lot on the night three weeks before the murder during the prior incident when the group of men was attacked. See *Morales*, 2012 IL App (1st) 101911, ¶¶ 3-6.

¶ 38    On appeal, one of the issues the defendant raised was the propriety of the admission of other crimes evidence, namely, the prior parking lot attack. He argued, much like defendant in the instant cause, that there was insufficient proof that he was present or involved in that

---

[2]Pursuant to our issuance of a Rule 23 order (Ill. S. Ct. R. 23 (eff. July 1, 2011)) in the instant cause with an identical holding as that presented here, the State filed a petition for rehearing pointing us to *Morales* and urging us to change our determination in light of that decision. Upon consideration thereof, as well as defendant's answer, we denied the State's petition. Subsequently, we have withdrawn our original Rule 23 order and have issued the instant opinion in its stead.

prior incident and, thus, any testimony regarding it should have been barred. See *Morales*, 2012 IL App (1st) 101911, ¶ 20. Also quite similarly, the State countered that testimony of the prior attack was not other crimes evidence but, rather, part and parcel of the charged offense as it provided a context for the subsequent murder and, thus, it was not required to show that defendant participated in it. See *Morales*, 2012 IL App (1st) 101911, ¶ 21.

¶ 39    After outlining the well-established legal principles concerning the admissibility of other crimes evidence, including that the State must first show that a crime took place and that the defendant participated in its commission, the *Morales* court departed from these and, instead, struck a distinction between what it called "extrinsic other crimes evidence" and "intrinsic other crimes evidence." *Morales*, 2012 IL App (1st) 101911, ¶ 24. Relying on three established cases wherein a defendant's other crimes evidence was found to be properly admitted against him, the *Morales* court distinguished between contested evidence that concerned " 'a necessary preliminary to the current offense,' " and that which did not. *Morales*, 2012 IL App (1st) 101911, ¶ 24 (quoting *People v. Manuel*, 294 Ill. App. 3d 113, 124 (1997), and citing *People v. Rutledge*, 409 Ill. App. 3d 22, 25 (2011), and *People v. Figueroa*, 341 Ill. App. 3d 665, 672 (2003)). It reasoned that, if the other crimes evidence sought to be admitted could be considered "part of the 'course of conduct' leading up to the crime charged, then it constitutes intrinsic evidence of the charged offense and its admissibility is not analyzed as 'other crimes' evidence, requiring proof that the defendant committed or participated in the uncharged offense." *Morales*, 2012 IL App (1st) 101911, ¶ 25 (quoting *Manuel*, 294 Ill. App. 3d at 124). Instead, the evidence is admissible under the much more general, and lower threshold, principles of ordinary relevance. *Morales*, 2012 IL App (1st) 101911, ¶ 24. Based on this reasoning, the *Morales* court found that evidence of the prior factory attack was properly admitted against the defendant because it believed the evidence was intrinsic to the subsequent murder, as it provided a context for that crime. See *Morales*, 2012 IL App (1st) 101911, ¶¶ 30-32. The *Morales* court then took this one step further, finding that this analysis was true regardless of whether the defendant was present at or participated in the prior incident. See *Morales*, 2012 IL App (1st) 101911, ¶¶ 30-32.

¶ 40    Our concern with *Morales* is this final step that it took, as we believe the fact of the defendant's presence and participation in the prior acts makes that cause critically distinguishable from the instant one. We note that, ironically, even though the *Morales* court ultimately declared it to be inconsequential, it cannot be denied that an eyewitness testified at that trial that he saw the defendant present at the prior incident and saw him participate in it. The *Morales* court itself repeated this fact several times throughout its decision, even specifically rebutting the defendant's argument that the eyewitness wavered regarding this identification on cross-examination. See *Morales*, 2012 IL App (1st) 101911, ¶¶ 31, 34 (finding the defendant's claim that eyewitness's identification was undermined to be "a proposition we find unsupported by the evidence" due to his testimony on direct examination).

¶ 41    Our more significant concern with *Morales* is that the only three cases it relies upon do not firmly support its holding that the defendant's involvement in the prior incident is irrelevant if the incident can be considered intrinsic other crimes evidence. That is, *Manuel*,

-14-

*Rutledge* and *Figueroa*, upon thorough examination, do not extol such a broad legal conclusion. It is true that these cases found that the prior incidents involved could be admitted pursuant to simple relevancy principles rather than requiring the higher threshold of proof for other crimes evidence. See *Manuel*, 294 Ill. App. 3d at 124; *Rutledge*, 409 Ill. App. 3d at 25-26; *Figueroa*, 341 Ill. App. 3d at 671-72. However, in each of these cases, the evidence was undisputed that the prior incidents involved those particular defendants. That is, there was no question that the defendants committed the prior acts sought to be introduced. See *Manuel*, 294 Ill. App. 3d at 123 (the defendant's prior drug sales were precursors to instant drug charges); *Rutledge*, 409 Ill. App. 3d at 25-26 (the defendant's prior physical assault of woman was intertwined with charged physical assault of police officer); *Figueroa*, 341 Ill. App. 3d at 672 (the defendant's prior drug dealings with the victim were part and parcel of the charged murder of the victim). We have no problem, in such cases where the defendant is clearly connected to the prior acts, proceeding with the lower relevancy threshold.

¶ 42 Yet, what is dangerous about *Morales* is that it attempts to expand these holdings to cases where it is unclear whether the defendant participated in the prior acts. In light of *Thingvold* and our other state supreme court cases, we cannot follow *Morales* in the instant cause. Again, while the *Morales* court seemed to think such a distinction was irrelevant to its analysis, it still went out of its way several times to highlight the eyewitness testimony regarding the defendant's presence at the prior attack. The instant cause is even further distinguishable. Here, the State admitted, and there was never any dispute, that defendant was not present at and did not participate in the scooter shooting. Rather, this prior act sought to be introduced against defendant involved solely codefendant. Without a directive from our state supreme court demonstrating that a distinction between intrinsic other crimes evidence and extrinsic other crimes evidence can be made when there is no doubt that the prior bad act does not even involve the defendant in any way, we will not do so based on the circumstances here.

¶ 43 Ultimately, before evidence of the scooter shooting could have been admitted against defendant at his trial, the State was required, under the principles of the admissibility of other crimes evidence, to show, beyond mere suspicion, that defendant was involved or participated in that crime. It admittedly did not.

¶ 44 CONCLUSION

¶ 45 For the foregoing reasons, we reverse defendant's conviction and remand his cause for a new trial, pursuant to our decision herein.

¶ 46 Reversed and remanded for new trial.

-15-